**E. J. BROOKS CO., Plaintiff,**

v.

**STOFFEL SEALS CORPORATION, Defendant,**

United States District Court
S. D. New York.
March 31, 1958.

Robert Henderson, Francis J. Sullivan, New York City, for plaintiff.

A. Yates Dowell and A. Yates Dowell, Jr., Washington, D. C., Baer, Marks, Friedman, Berliner & Klein, New York City, George H. Klein, New York City, of counsel, for defendant.

DAWSON, District Judge.

This action is for patent infringement. It relates to small metal tags or seals which are attached to poultry for grading, identification, inspection or trademark purposes. The patents involved are:

Ashton Patent No. 2,611,198, owned by defendant; Stelzer Patent No. 2,611,199, owned by defendant; Moberg Patent No. 2,686,379, owned by plaintiff.

The issues essentially are:

(1) Are these patents valid, and

(2) Have these patents been infringed?

Plaintiff presents still another issue:

(3) Does a justiciable controversy exist as to defendant's Stelzer Patent No. 2,611,199?

The parties are corporate manufacturers of poultry seals which are seals adapted to being clipped on to dressed poultry so that the purchaser may, by observing them, ascertain the brand names and, in some cases, inspection or grading information.

### The Pleadings

Plaintiff and defendant are competitors and appear, from the testimony, to be the only manufacturers of poultry seals. Plaintiff's original complaint alleged that a controversy existed with respect to defendant's Stelzer patent No. 2,-611,199 and asserted that the patent was invalid. Defendant's answer denied that any controversy existed with respect to the Stelzer patent and denied that the Court had jurisdiction. In its amended answer defendant, in its first counterclaim, claimed ownership of the Ashton patent and alleged infringement by the plaintiff. Plaintiff replied with allegations of invalidity of the Ashton patent and denied infringement, and also as-

serted an estoppel against the defendant because of the lapse of time between the date of the patent and the date of the answer. In a supplemental complaint plaintiff alleged the issuance to it of Moberg Patent No. 2,686,379 and alleged infringement by the defendant. In answer to this supplemental complaint the defendant denied validity of the patent and denied infringement. In defendant's second amended answer a second counterclaim alleged activities of unfair competition by the plaintiff. However, at the trial, it was agreed that the issues relating to unfair competition would not be pressed and that the case would be tried solely on the issues of validity and infringement of the respective patents. However, plaintiff claims that the defendant elected the Stelzer application over the Ashton application (both of which had been assigned to it) during proceedings in the Patent Office and that, therefore, defendant is now estopped from asserting that the Ashton patent had priority over the Stelzer patent.

### Parties and Jurisdiction

1. Plaintiff, a New Jersey corporation, has been engaged for approximately 75 years in marketing and selling various types of metal seals, and for a number of years made and sold such seals for use on poultry. Defendant, a New York corporation, has been making and selling such metal seals, including seals for use on poultry, some ten years.

2. This Court has jurisdiction of this action under 28 U.S.C. §§ 1338, 2201. Jurisdiction might also be founded on diversity of citizenship since the amount in controversy exceeds $3,000.

### Discussion
### Is the Ashton Patent Valid?

This patent was issued September 23, 1952. The inventor is Ernest Ward Ashton of Ottawa, Canada, who assigned the invention to the defendant Stoffel Seals Corporation.

The inventor said in the patent specifications that in the past wing tags for attaching to poultry had been popular; that they were usually so made that they could be secured to the wing of the bird but were unsuitable for clipping to the breast and that

"Recently, however, there has been a demand for a breast tag, that is to say, a tag that may be secured to the breast of the fowl carcass rather than the wing. Wing tags are not satisfactory for that purpose for the reason that when secured to the breast they stand more or less erect whereas a satisfactory breast tag should lie flat on the breast."

The essential nature of the Ashton patent is set forth in Claims 6, 7, 8 and 9, of which claims Claim No. 6 is representative. This claim reads as follows:

"6. A tag structure comprising a main portion having an aperture, a locking tongue having a tip, said tongue extending normally at an angle with respect to said main portion and being integral therewith, said tongue comprising two sections joined to each other by a bendable knee, whereby said two sections form a toggle, which when moved against said main portion flattens out and lengthens to thereby bring about engagement of said tip of said tongue with said aperture."

Plaintiff urges that the patent is invalid (1) because it was anticipated in the prior art, (2) because it is indefinite, (3) because defendant elected Stelzer as the first inventor, (4) because of lack of invention and (5) because the claims were presented to the Patent Office with deceptive intent.

Defendant claims that the "invention" was that of Ashton who was the "first to conceive of embodying a toggle into a poultry tag thereby producing a seal which not only met long standing needs but which was substantially cheaper to produce."; or that "the invention was the embodiment in the seal of a toggle which, when operated, clamps the material into the seal."

The evidence would indicate that the old type poultry seals, prior to Ashton,

were made of a piece of metal which was bent over and had a point which extended inward when the seal was pinched together, which point went through the skin of the fowl and then frequently into or through an aperture where it was bent over and thereby locked. What Ashton did was to include the mechanical elements which comprise a toggle. Webster's New Collegiate Dictionary defines a "toggle joint" as

"A device consisting of two bars jointed together end to end but not in line, so that when a force is applied to the knee tending to straighten the arrangement, the parts abutting or jointed to the ends of the bars will experience an endwise pressure."

Thus, instead of a tag where one portion is bent over on part of another with a point transfixed to the substance which is tagged, the Ashton patent as the upper part of the tag has a piece which is bent at the middle (thereby forming a knee) so that when pressure is applied to this knee joint it pushes the end out so as to engage with the rim or an indentation of the lower part and this engages with the substance to be tagged. It is claimed that pressure on the knee forces the end out and creates the toggle action.

It was the addition of the toggle action which resulted in the patent being allowed by the Patent Office as an advance over the previous art, as appears from a letter of the Patent Examiner, dated July 28, 1952, in Plaintiff's Exhibit 4.[1]

This might seem like a small difference in the construction of the tag, but the evidence is sufficient to convince the Court that never before the Ashton invention had the toggle principle been used in poultry tags or similar tags. The prior art mentioned in the action will be discussed later in this opinion.

If we assume that the change made by Ashton displayed originality, the next question to consider is whether it displayed invention in the sense of meeting a need in the industry in which it was to be applied. Prior to the Ashton patent numerous patents had been taken out on various types of metal seals. Plaintiff company itself had taken out several hundred patents.

The officers and employees of both plaintiff and defendant had admittedly been working for many years prior to 1952 to produce an improved seal for use on poultry. They were seeking a seal, inexpensive to produce, which could be applied to the chicken by the use of one hand and which could be removed easily by a housewife. Substantially all the seals used up to that time had been clip type seals which had two sides bent together to hold between them the object which was to be sealed. The Ashton patent was not merely a clip since it embodied mechanical elements which comprised a toggle, which presupposes a knee joint comprising two struts so connected that they may be brought into a straight line when force is applied at the joint, thus producing great endwise pressure which clamps the skin or breast of the chicken against the edge of the clip. Thus, instead of the tag piercing the skin of the fowl it pinches it against the rim of the cup-shaped portion. The application of this seal to the fowl is described in column 2, lines 24–45, of the Ashton patent.[2]

1. "Claim 17 even if amended as proposed would not recite the toggle-like action on which the allowance of the claims in the case was predicated and which was thoroughly discussed with applicant's attorney, at a recent interview."

2. "In order to secure one of the tags to the breast of a fowl it is merely necessary to bring the tag into contact with the skin as shown in Figure 2 and to squeeze the tag between the thumb and forefinger. The edge of the end-wall 2 rests on the skin of the fowl and a small section of skin indicated at 18 is engaged by the point 16 and forced toward the aperture 7. As the pressure of the thumb and forefinger is continued the toggle-shaped tongue 10 is gradually straightened as the angle between the parts or sections 11 and 12 approaches 180°. Meanwhile the point 16 forces the fold of skin 18 into contact with the convex sides 8 of the aperture 7 and the point 16 together with the skin is forced

The Court finds that the Ashton seal had certain advantages for which the industry had been looking and had not found in earlier seals where the pin turned inwardly and where there was no toggle action. Since the introduction of this Ashton seal the sales of the new type have increased tremendously. The testimony of Mr. Stoffel, although an interested party, is nevertheless clear and convincing. He pointed out that the industry had been searching for a seal which could be attached rapidly and easily and which could be manufactured at a low cost; and that up to the time of the Ashton seal all seal manufacturers apparently thought that it was necessary to have a prong which would pierce the skin and be received in a lock on the opposite side of the skin. He also pointed out that the Ashton seal, which employed a toggle pinching action rather than a piercing action, could be easily attached to any part of the fowl, and this by the use of one hand, thus saving labor and time;[3] and that in the toggle seal the area of the toggle back is less than that of the front of the seal, thus reducing the cost of material and reducing the weight and resulting in savings in freight charges, packing charges and dies.

■ The evidence was that since the introduction of seals embodying a toggle action there has been widespread commercial acceptance of such seals by the leading poultry processors in the country. There was testimony, which is undisputed, that toggle seals constitute approximately 95% of all the seals which are being used today. This commercial acceptance in a period of a few years is some indication that there was invention displayed by Ashton in the seal developed by him.

The Court concludes that the Ashton patent displayed invention and that it was not indefinite.

■ Plaintiff has referred to certain patents, not cited by the Patent Office, which it contends anticipated the Ashton invention. A number of patents were introduced at the trial as indicating anticipation, but those principally relied upon by plaintiff, as indicated in its post trial brief, are:

Buck & Barnes Patent No. 492,085
Bicknell Patent No. 1,163,127
Thompson Patent No. 1,506,956.

Each of these patents is for a clip or seal but none of them embodies the principle of a toggle resulting from a bendable knee and the endwise pressure resulting therefrom. This is equally true of the other patents cited by plaintiff at the trial. Not one of them used a toggle action in the sense used in the seal described by Ashton, since none of them had a bendable knee to develop the extra endwise pressure which is characteristic of the toggle action.

The Court concludes that the Ashton patent was not anticipated by the prior art.

■ Plaintiff makes the further contention that the Ashton Patent No. 2,611,198 is invalid and void because defendant made an election of Stelzer over Ashton, and since the two patents cover, allegedly, the same invention, the non-elected patent cannot be valid. Plaintiff, in effect, is contending that if there was an invention that Ashton was the inventor, but that when defendant elected Stelzer the Stelzer patent was invalid because he was not the first inventor and that the Ashton patent was void because the Stelzer patent was elected by the common owner as the prior invention.

forwardly along the sides 8 and finally through the aperture 7. Continued pressure at this stage forces the locking tongue 10 to snap into the reverse angular position shown in Figure 5. In that position the tag is 'locked' to the skin of the fowl carcass and may not be removed without damage to or destruction of the tag."

3. The testimony was that a competent operator could tag 3,000 chickens per hour with this type of seal.

Plaintiff further contends that the issuance of the two patents, covering similar subject matter, constitutes double patenting which would invalidate the Ashton patent.

From the facts it appears that Stelzer, working as an employee of Stoffel, had been working on the development of seal patents for a number of years. Defendant's president, Stoffel, first saw the Ashton seal in November 1948 at the Royal Winter Fair in Toronto, Canada, and recognized this seal as a superior toggle type seal which he had not seen before. Returning to the United States he directed his engineers to produce a seal of this type, and an application for a patent was subsequently filed by Stelzer. The Ashton patent application was filed Janary 31, 1949 and the Stelzer patent application was filed March 4, 1949. Defendant Stoffel Seals Corporation was the employer of applicant Stelzer and the assignee of his rights in his patent application. In 1951 defendant purchased the rights in the Ashton patent application from its Canadian owner, Ketchum Manufacturing Company, in order to protect itself against conflicting claims. On June 30, 1952, defendant by its patent attorney for the Stelzer application wrote to the Patent Commissioner adding two claims to the Stelzer application which used the word "toggle" and which had been present in the prior Ashton application. The attorney stated:

"Added claims 38 and 39 have been copied from U. S. Patent Application Ser. No. 73,837–Ashton in which they were allowed as claims 18 and 19. It is to be noted that this Ashton case, as well as the further Ashton application Ser. No. 157,233 and the present application are owned by the same assignee who believes that the priority should be awarded to the present application. Since all these applications are intended to be issued on one and the same day, Examiner is respectfully solicited to act on these cases simultaneously so that final disposal of these cases may be had at an early date."

However, claims 6 through 9 of the Ashton patent, which are comprehensive statements of the toggle claims, were not removed from the Ashton application nor added to the Stelzer application. It is to be noted that in Canada the Stoffel Seals Corporation relinquished its claims in a Canadian application of Stelzer in favor of the Ashton Canadian application owned by Ketchum Manufacturing Company.

Defendant says that it did not know, under the patent laws of the United States (35 U.S.C. §§ 102, 104) whether or not the Stelzer or the Ashton applications were entitled to legal priority of invention in the United States. Defendant says that not until the Downing deposition was taken in the fall of 1956 did it know that the Ashton patent was introduced into the United States in November 1948, a date earlier than Stelzer's invention date. Defendant says this was the first that it knew that the Ashton application was indeed prior in invention to Stelzer. Defendant says that it had no prior knowledge of these facts, although its attorney had sought to learn such facts. Promptly after it learned the facts and after the issuance of the Stelzer patent, defendant entered a formal disclaimer in the Patent Office of claims 3, 7, 10, 11, 12, 13, 24 and 25 of the Stelzer patent, which appeared to them to be in possible conflict with the claims of the Ashton patent. Claims 24 and 25 are the two claims which were originally removed from Ashton. Defendant felt the remaining claims in the Stelzer patent not to be of the same scope as those of the Ashton patent and defendant's president testified at the trial that it is his present view that Stelzer invented improvements over the Ashton construction and that the remaining claims cover such improvements.

Defendant contends that its statement to the Patent Commissioner saying that it believed that priority should be awarded to the Stelzer application was not in fact an election of the Stelzer patent ap-

plication over the Ashton application. Defendant points out that in good faith it believed that Stelzer was in a legal sense the first inventor in the United States and further, to hold its statement to be an election would be inconsistent with its relinquishing its claims in the Stelzer Canadian application in favor of the Ashton Canadian application and its later disclaimer of claims in Stelzer. Defendant points out that as soon as it realized that Stelzer was not the first inventor, it, in good faith, removed claims from the Stelzer patent by entering a disclaimer of said claims. Defendant further contends that as to claims 6, 7, 8 and 9, the claims in suit, these claims were left in the Ashton patent and that Stelzer was never elected as the first inventor of the subject matter of those particular claims, but that this constituted an election of Ashton as the first inventor of that subject matter.

■ The Court finds that defendant's application for priority in its letter of June 1952 does not in fact constitute an election by defendant assignee of the Stelzer patent over the Ashton patent. It may be very difficult for an assignee of two similar patents to determine priority of invention; or to determine if there is only one inventor of an idea and that the invention was neither known nor introduced earlier into the United States. See 35 U.S.C. § 102. In this Circuit the consequences of a mistaken election may be very severe. Cf. United Chromium, Inc., v. General Motors Corp., 2 Cir., 1936, 85 F.2d 577, certiorari denied, 300 U.S. 674, 57 S.Ct. 613, 81 L.Ed. 879; Amdur, Patent Office Rules and Practice, § 201(b), p. 597 (1955); with Bestwall Mfg. Co. v. United States Gypsum Co., 7 Cir., 1923, 290 F. 798, certiorari denied 263 U.S. 713, 44 S.Ct. 132, 68 L.Ed. 520; Colgate-Palmolive-Peet Co. v. Lever Bros. Co., 7 Cir., 1937, 90 F.2d 178, 189, certiorari denied, 302 U.S. 729, 58 S.Ct. 54, 82 L.Ed. 563. Resultantly, the election of one patent over another by an assignee or an inventor must be clear. Cases dealing with election of patents have been primarily concerned with the situation where an applicant or assignee elects to have one patent issued to him first, and then later seeks to have another patent issued on similar or related claims. The election of the first patent is held to preclude the issuance of a second patent. See, e. g., Application of Ward, Cust. & Pat.App.1956, 236 F.2d 428; In re Willoughby, 1937, 88 F.2d 482, 24 C.C.P.A., Patents, 1033; In re Dunbar, 1922, 51 App.D.C. 251, 278 F. 334; Ex parte Kalinske, 105 U.S.P.Q. 501 (1954). This accepting of a first patent by a common assignee or inventor has been held to be equal in legal effect to a concession of priority of invention of the first patent, and this may be so even though the claims of the first patent are actually invalid. In re Mann, 1931, 47 F.2d 370, 18 C.C.P.A., Patents, 1020; In re Fischel, 1943, 136 F.2d 254, 30 C.C.P.A., Patents, 1085. The major concern of the courts in all of these cases appears to have been avoidance of an extension of the time period of the patent monopoly, which is involved in double patenting. But cf. In re Fischel, supra, where the court pointed out the value of election as also a means of avoiding determination of priority of invention and of avoiding the issuance of two patents for one invention. See also Application of Siu, 1955, 222 F.2d 267, 42 C.C.P.A., Patents, 864.

■ In this case there would appear to be no issue of extension of the patent monopoly, or double patenting, since both patents were issued to the common assignee on the same day. See Amdur, Patent Office Rules and Practice, 79(f) (1955); 69 C.J.S. Patents § 38; Deister Concentrator Co. v. Deister Machine Co., 7 Cir., 1920, 263 F. 706; Shimadzu v. Electric Storage Battery Co., D.C.E.D.Pa.1936, 17 F.Supp. 42, reversed on other grounds, 307 U.S. 5, 613, 59 S.Ct. 675, 83 L.Ed. 1071. See also In re Willoughby, supra; Federated Tel. & Radio Corp. v. Associated Tel. & Tel. Co., D.C.D.Del.1951, 99 F.Supp. 535; Amdur, supra, § 79(b). It is, of course, clear that although an inventor or common assignee properly should receive only one

patent on one inventive thought, improvements on the original idea may in themselves be patentable. Application of Stanley, 1954, 214 F.2d 151, 41 C.C.P.A., Patents, 956. Further, where two patents are issued to one inventor on the same day, on similar matter, and therefore no issue of extension of patent monopoly exists, it appears that the patentee may elect the patent on which he will rest his monopoly. Electrical Accumulator Co. v. Brush Electric Co., 2 Cir., 1892, 52 F. 130; H. W. Johns Mfg. Co. v. Robertson, C.C.S.D.N.Y.1898, 89 F. 504.

Resultantly, the real question in this case is whether the assignee's letter to the Patent Commissioner, in which he expressed his opinion as to the priority of the Stelzer application, constitutes an election of the Stelzer patent over the Ashton patent, in conformity with the meaning of the above cases dealing with election. The Court does not find that to have been the case. The patentee did not withdraw his application for the Ashton patent, nor did he accept the issuance of the Stelzer patent on a prior date, either of which activities would have constituted an election of the Stelzer patent. It further appears that defendant left the determination of priority or of conflict of claims up to the Patent Commissioner, who saw fit to issue both patents. It would have been proper for the Commissioner to ask for correction of claims if he thought that there were conflicting claims or a question of priority of invention (35 U.S.C. § 135); Ex parte Hodnette, 71 U.S.P.Q. 38 (1946); In re Dunbar, supra; but this the Commissioner did not choose to do. The very issuance of two patents on the same day suggests that one patent was not elected as against the other.

If there had been an interference proceeding held between these two patent applications, the patent rules provide that an election must be made in writing and be signed, and further provide that a concession of priority cannot be made by the assignee on behalf of the inventor. 37 C.F.R. § 1.262. However, under the patent rules, interference proceedings are not normally to be brought where the two patent applications are held by a common assignee. 37 C.F.R. § 1.201(c).

In light of the difficulty of determining priority of invention and of the fact that an election of a patent can void a subsequently issued patent, the Court cannot find that assignee's vague expression of opinion under the circumstances here constituted such an irrevocable and binding election. Particularly is this true in this case where there is no extension of the patent monopoly and the title to the two disputed patents is conceded to be in the assignee.

### Has the Ashton Patent Been Infringed by the Plaintiff?

Mr. Brooks, president of the plaintiff, knew of the Ashton seal in July 1951 when a Mr. Snow of his company saw it in Canada. A copy of the Ashton seal was procured and Mr. Brooks obtained it. Mr. Brooks gave this seal to Mr. Moberg, the plant manager of his company, and apparently suggested that a seal of this type be made by him. Moberg sought to get a die-maker to make such a seal for him, but since the die-maker was a man who did work for the Stoffel Company he refused to take on an assignment from the Brooks Company. However, thereafter, the plaintiff company produced a seal which had the toggle characteristics of the Ashton seal and such seal has been sold by this company since that time. The exhibits offered in evidence showed that seals produced and sold by the plaintiff company were an infringement of the invention described in the Ashton patent. Certain advertisements by the plaintiff company showed seals which had the characteristics of the Ashton patent and were conclusive proof of infringement by the plaintiff company.

The plaintiff company sought to establish the absence of infringement by making certain "improvements" over the Ashton seal. The Brooks Company and Mr. Moberg took the position that the Ashton patent covered a seal only where

the toggle seal underwent "reverse angularity," i.e., where the knee when bent reached a position where the back of the seal was not merely flat but where the joint of the knee went beyond 180°. The plaintiff company contended that this reverse angularity was an essential part of the Ashton invention. They point to lines 31–43 of column 2 in the Ashton patent, which read in part as follows:

" * * * As the pressure of the thumb and forefinger is continued the toggle-shaped tongue 10 is gradually straightened as the angle between the parts or sections 11 and 12 approaches 180°. * * * Continued pressure at this stage forces the locking tongue 10 to snap into the reverse angular position shown in Figure 5. In that position the tag is 'locked' to the skin of the fowl carcass and may not be removed without damage to or destruction of the tag."

However, Claim 6 of the Ashton patent does not require reverse angularity. Claims 1 and 2 do, at the end, refer to reverse angularity. However, it is apparent to anybody that the question as to whether the toggle knee joint straightens to a position of 180° or goes beyond that point is a question of the amount of pressure applied to the knee joint, and also a question of the size of the skin or other part of the fowl carcass which is engaged by the tongue. With substantial pressure applied the knee joint might undergo reverse angularity; with slight pressure, or with a larger amount of skin engaged by the tongue, it would not undergo reverse angularity. The possibility of reverse angularity and the locking occasioned thereby is, of course, present, but it is not an essential part of the invention because it is not part of the structure but rather a question of the amount of pressure applied to the structure.

The plaintiff company apparently thought it would be desirable to have a seal which would be prevented from undergoing reverse angularity so that it would be easier for the housewife to slip a knife under the seal to open it. Therefore, Mr. Moberg in designing his seal employed a "bead" or a "dimple" to prevent the tongue from going so far as to result in reverse angularity and also made the opening into which the tongue would go smaller, so as to prevent reverse angularity. The plaintiff company contended that this seal was not an infringement of the Ashton seal because of the absence of reverse angularity, but as their attorney frankly stated, with reference to this additional feature of their seal:

" * * * we were simply being cautious in trying to be a little more sure of ourselves when we adopted the dimple." (R. p. 524.)

The attorney, however, admitted that

" * * * if the first seal without the dimple were an infringement that the second one would also be an infringement." (R. p. 524.)

Mr. Moberg applied for a patent on his seal which was granted on August 17, 1954, said patent having first been assigned to the plaintiff company. This is one of the patents in suit.

It appears very clear from the testimony and the exhibits that the seal designed by Moberg and used by the plaintiff company embodied the inventive toggle action of the Ashton seal. The mere addition of another feature to it—if such additional feature was adopted—would not prevent the seal from being an infringement of the Ashton patent with which the plaintiff company was well acquainted.

The Court concludes that the plaintiff company has infringed the Ashton patent and is now infringing the Ashton patent by the seals manufactured and sold by it.

### Validity of the Moberg Patent

The Moberg patent covers a structure substantially the same as the Ashton structure. Moberg was acquainted with the Ashton seal and the Ashton patent before he designed his seal. Mr. Moberg was asked the following question

by the Court and gave the following answer:

"Q. Mr. Moberg, you have been in this business a long time. What did you actually invent? What did you get this patent for? What was your invention? A. My invention was the bent-up tip and the—reversely bent tip on the member and, as well as the — my — I would say the dome, or the slit dome, where the bent-up tip comes into, is my invention." (R. p. 554.)

Moberg, in his original patent application, did not refer specifically to any co-action between the tip and the bent-up aperture. This was inserted by him by an amendment of January 1954. In the application for this amendment, Moberg's attorney stated that "the claimed improvements [over Ashton, Stelzer and the prior art] may be considered by the Examiner as only a slight step forward in the art." He urged, however, that the patentee "should be granted the limited protection which he now claims so that he will have protection on his *improvement*." (Emphasis supplied.)

Mr. Moberg admitted that nowhere in his patent did he define the bent-up tip or the dome slit as his invention. He was asked the following questions and gave the following answers:

"Q. How did you decide that you wanted that tip to go up instead of going down? What made you decide that? A. Well, in designing anything, you try it on the — whatever article you are designing it for and you observe.

"Q. And it worked better if you had the tip go up? A. Yes, definitely. It would dig in otherwise.

"Q. So you just turned it up? A. Yes, sir.

"Q. Any mechanic could do that, if he wanted? A. Certainly." (R. p. 557.)

The essential trouble with the Moberg patent is that his claim is not limited to the "improvement" which he states is his invention. His claim is so broad that it would comprehend many elements of seals which do not have what the inventor now claims is an "improvement."[4]

Section 112 of the Patent Code, 35 U.S.C., provides in part:

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

_4. The claim in the Moberg patent is described as follows:

"A tag of sheet material comprising a a first main-section having a struck-up portion which defines a slit-opening toward one side edge of said first section and has an inner surface in acute angular relationship to an adjacent surface of said first section, a second main-section connected in angular relationship to said first main-section at an opposite side edge of the latter and bendable at such connection to a smaller angle relatively to said first section in closing the tag, a piercing-member connected to said second section remote from said first-mentioned connection and extending angularly from said second section in an initial relationship thereto, within the angle formed by the two main-sections and bendable at the last-mentioned connection to a greater angle relatively to said second section in closing the tag; the piercing-member having a reversely bent tip, the distance from the tip extremity of the pierc-ing-member to the said first-mentioned connection prior to closing of the tag being less than the distance between said first-mentioned connection and said slit-opening whereby to permit said reversely bent tip, upon bending of the two main-sections at said first-mentioned connection to a smaller intervening angle, to pass the edge of said struck-up portion and enter said slit-opening, and said inner surface of said struck-up portion and said adjacent surface of said first main-section coacting with opposite faces of the reversely bent tip of said piercing-member to oppose angular movement of said piercing-member about its connection to said second section and thereby oppose complete flattening of the angle between the second main-section and the piercing-member when the two main-sections are bent toward each other in applying the device to merchandise and to preserve, between said two main-sections, a space for receiving a prying instrument for opening the tag."

The Moberg patent failed to comply with this provision of the Patent Code. It did not distinctly claim the "improvement" as the invention. The principle is well established that if a patent for a combination claims more than the applicant invented, the patent is void. See Evans v. Eaton, 1822, 7 Wheat 356, 20 U.S. 356, 5 L.Ed. 472; Lincoln Engineering Co. v. Stewart-Warner Corp., 1938, 303 U.S. 545, 58 S.Ct. 662, 82 L. Ed. 1008; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 150, 71 S.Ct. 127, 95 L.Ed. 162. In United Carbon Co. v. Binney & Smith Co., 1942, 317 U.S. 228, 236, 63 S.Ct. 165, 170, 87 L.Ed. 232, the Court said:

"The statutory requirement of particularity and distinctness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field. Moreover, the claims must be reasonably clearcut to enable courts to determine whether novelty and invention are genuine."

The invention here is not claimed to be a combination but rather the addition of a single element to what was previously known in the art. In such a case, where the invention embraces only one or more parts, "the part or parts claimed must be specified and pointed out, so that constructors, other inventors, and the public may know what the invention is and what is withdrawn from general use." Parks v. Booth, 1880, 102 U.S. 96, 102, 26 L.Ed. 54.

In the present case Moberg did not in his patent claim as his invention that new part which he now admits is the only invention made by him. He did not comply with § 112 of the Patent Code. He, in effect, described a structure which had already been patented, with one slight change or improvement in it, and then secured a patent not limited to the improvement but covering the entire structure. Properly his claim should have been limited to the "improvement." Having secured a patent which covers more than the invention, the entire patent is void.

The Court concludes that the Moberg patent is invalid.

### Validity of the Stelzer Patent

As has heretofore been stated, the Stelzer seal was made by Stelzer after he saw the Ashton seal. He applied for a patent on March 4, 1949. The patent was issued to him on September 23, 1952, after he had assigned the application to the defendant. This patent was issued on the same day as the Ashton patent, which was also assigned to the defendant. Thereafter on November 19, 1956, the assignee filed a disclaimer of claims 3, 7, 10, 11, 12, 13, 24 and 25 of the Stelzer patent.

The defendant has taken the position that there is no controversy between the parties as to the Stelzer patent, in that the defendant does not claim that the plaintiff has infringed this patent. However, the proof shows that letters were sent to certain prospective customers of the plaintiff in which the defendant advised these customers that defendant's patent counsel were of the opinion that the seals made by the plaintiff company infringed certain patents held by the defendant, and gave the numbers of those patents, which included both the Ashton and Stelzer patents.

The Court finds as a fact that as early as 1952 the defendant charged the plaintiff, either directly or by letters to customers, with infringing the Stelzer patent. At the trial counsel for the defendant indicated that they did not find that the Stelzer patent was infringed by anything done by the plaintiff company. However, having made implied threats to the plaintiff and plaintiff's customers, which resulted in the institution of this action, defendant cannot now, by retract-

ing earlier statements, keep the plaintiff from having a declaration as to the validity or invalidity of the Stelzer patent.

When a patentee notifies the trade that a competitor is infringing his patents, this entitles the competitor to bring an action under the Declaratory Judgments Act, 28 U.S.C. § 2201, to determine the validity of the patents and whether or not he is actually infringing them. Leach v. Ross Heater & Mfg. Co., 2 Cir., 1939, 104 F.2d 88; Mitchell & Weber, Inc., v. Williamsbridge Mills, Inc., D.C.S.D.N.Y.1936, 14 F.Supp. 954; 6 Moore, Federal Practice, Par. 57.20 (2d Ed.1948). Defendant cannot create a situation of actual controversy which gives the Court jurisdiction under the Declaratory Judgments Act and then, after the commencement of suit, come into Court and seek to avoid the jurisdiction of the Court by belated concessions that there was no infringement.[5] See, e.g., Kobre v. Photoral Corp., D.C.S.D. N.Y.1951, 100 F. Supp. 56. See also concurring opinion of Chief Judge Clark in McCurrach v. Cheney Bros., 2 Cir., 1945, 152 F.2d 365, 367. Since there was such controversy here, plaintiff is entitled to have the Stelzer patent considered by the Court. The Court will also follow the better practice suggested by the Supreme Court and consider the issue of the validity of the patent.[6]

This, therefore, raises the issue as to whether the remaining claims of Stelzer which have not been waived— i.e., claims 1, 2, 4, 5, 6, 8, 9, 14, 15, 16, 17, 18, 19, 20, 21, 22 and 23—constitute invention and a valid patent. Essentially these claims describe a structure similar to that of the Ashton structure. Defendant's counsel urge in their brief that these remaining claims include the following features not found in the Ashton patent:

Claims 1, 2, 4, 5, 8, 9, 15, 16, 17, 18, 19 and 20 recite "weakening means" at the bendable knee and/or at the base of the locking tongue.

Claims 6 and 21 recite a "curled over rim."

Claim 14 recites "means to prevent salvage of said tag for re-use," (but it does not describe such "means").

Claim 21 recites "shoulders on the tongue" and a "curled over" part to form a "partly closed rim."

5. This is particularly true here where defendant sought to limit its admission that there was no infringement of the patent. Defendant first stated:

"We don't find that the Stelzer patent is infringed by anything that Brooks is making or has presented here." (R. p. 52), but later sought to modify this position by saying that:

"We don't claim any infringement [of the Stelzer patent] and, if there should happen to be any, we waive it. * * * We do not admit that its terms are not infringed. We simply say we don't make any claim of it, and, if it is infringed we waive it. So we rest our case entirely on the Ashton patent." (R. pp. 121, 122.)

The fact that defendant chooses not to counterclaim for infringement of its Stelzer patent does not avoid the jurisdiction of the Court over plaintiff's claim under the Declaratory Judgments Act if there is actual controversy. This is not like the situation in Cover v. Schwartz, 2 Cir., 1942, 133 F.2d 541, certiorari de-

nied 319 U.S. 748, 63 S.Ct. 1158, 87 L. Ed. 1703, where plaintiff had brought a suit for infringement of three patents and abandoned his contention that the defendant had infringed the third patent. In such case, the Appellate Court properly held that no controversy existed as to the third patent, and there were no grounds for considering the validity of plaintiff's patent as he requested it to do.

6. See Sinclair & Carroll Co. v. Interchemical Corp., 1945, 325 U.S. 327, 330, 65 S. Ct. 1143, 89 L.Ed. 1644; Dow Chemical Co. v. Skinner, 6 Cir., 1952, 197 F.2d 807, certiorari denied, 344 U.S. 856, 73 S. Ct. 94, 97 L.Ed. 664.

A decision as to invalidity, if the patent is invalid tends to discourage suits and threats of patent suits against defendant and others, based upon the patent, which may prevent the lawful competition which is in the public interest. See Cover v. Schwartz, 2 Cir., 1942, 133 F.2d 541, at page 545, certiorari denied, 319 U.S. 748, 63 S.Ct. 1158, 87 L.Ed. 1703.

Claim 22 recites "knockouts in the front face of said body portion to facilitate insertion of an instrument to push said tongue into an unlocked position and to render said tag unuseable."

Claim 23, it is said, recites a "prong" extending from the body portion.

It may be pointed out that not one of the features on which defendant now relies was specifically claimed as the invention by Stelzer. They are features which are included in the general claims relating to a general structure which is referred to in the specifications as a "tag * * * for easy attachment to the breast of a chicken or turkey by pinching a loose and thin skin portion thereof without piercing or damaging it, only one hand of the operator being employed to achieve such attaching operation." The specifications also state: "Before explaining the present invention in detail, it is to be understood that the invention is not limited in its application to the details of construction and arrangement of elements illustrated in the accompanying drawings, since the invention is capable of other embodiments and of being practiced or carried out in various ways."

It must be kept in mind that the Stelzer patent was applied for after Stelzer was acquainted with the Ashton seal; that the Stelzer patent, in various claims, covered the same structure described in the Ashton patent, with the result that after the Stelzer patent was issued the common assignee of both the Stelzer and Ashton patents disclaimed certain claims in the Stelzer patent. There was no evidence submitted to the Court sufficient to convince it that the isolated references in the remaining claims, which are now relied on by the defendant, constituted invention. Certainly nowhere in the claims are these isolated features described as the invention.

This poses the problem of whether an applicant for a patent may describe a structure known to the art, add a few minor refinements to it, get a patent on the entire structure, and then disclaim a patent on the structure itself but continue to claim a patent on the minor refinements, although at no time has the applicant distinctly claimed the refinements as his invention. Nobody reading such a patent would know what it did or did not cover. The remaining claims in the Stelzer patent are not claims as to the refinements themselves. The patent does not describe these refinements as the invention. Additionally, many of the refinements seem to be obvious refinements which could have been the product of the work of any mechanic skilled in the art, such as adding "weakening means" at certain points, or using a "curled over rim." If any of these features which continue in the remaining claims are an invention they should have been specifically described as such. Since the patent does not claim these features as the invention, the patent is worthless. See Evans v. Eaton, 1822, 7 Wheat. 356, 20 U.S. 356, 5 L.Ed. 472.

The Court concludes that the Stelzer patent is invalid.

### Conclusions

The Court makes the following findings of fact and conclusions of law:

1. Ashton Patent No. 2,611,198 is owned by the defendant and is a valid patent.

2. The plaintiff has infringed and is infringing claims 6, 7, 8 and 9 of the Ashton patent and threatens to continue to do so, and defendant has no adequate remedy at law with reference thereto.

3. Moberg Patent No. 2,686,379 is owned by the plaintiff but is invalid.

4. Stelzer Patent No. 2,611,199 is owned by the defendant but is invalid.

5. Defendant is entitled to a decree declaring the Ashton patent to be valid and to have been infringed by the plaintiff, and granting the injunction thereon sought by the defendant, and directing that the action be referred to a master for a determination of damages, and providing for the payment of taxable costs to the defendant. The issue as to whether the defendant is entitled to treble damages pursuant to § 284 of Title 35 U.S.Code shall be considered by the

master in connection with his determination of damages, but his findings thereon shall be subject to the review and final determination of this Court.

Submit proposed form of decree on five days' notice.

This opinion shall constitute the findings of fact and conclusions of law of the Court.