**FOREST LABORATORIES, INC.,**
**Plaintiff,**

v.

**FORMULATIONS, INC. and the Pillsbury Company, Defendants.**

**No. 67–C–128.**

United States District Court
E. D. Wisconsin.
April 15, 1969.

Foley, Sammond & Lardner by James P. Brody, Milwaukee, Wis., for plaintiff.

Wherry & Wherry, Milwaukee, Wis., for Formulations, Inc.

Quarles, Herriott, Teschner, Clemons & Noelke, Adrian L. Bateman, Jr., Milwaukee, Wis., for The Pillsbury Co.

## DECISION

MYRON L. GORDON, District Judge.

This is an action for improper use and disclosure of what are alleged to be the plaintiff's trade secrets. Jurisdiction is based on diversity of citizenship, and state law is to be used to determine the substantive issues. Smith v. Dravo, 203 F.2d 369 (7th Cir. 1953); Besly-Welles Corp. v. Balox, Inc., 291 F. Supp. 328 (E.D. Wis. 1968). In addition, the defendant, Pillsbury, has counterclaimed for a declaratory judgment of invalidity of the plaintiff's patent.

Formulations, Inc. was dismissed from the action during the course of the trial, pursuant to rule 41(b), Federal Rules of Civil Procedure. The plaintiff's cause of action based on the anti-trust laws was likewise dismissed under the same rule.

## I. THE TRADE SECRET CAUSE OF ACTION

It is alleged that Pillsbury has illegally used and divulged the plaintiff's trade secrets for packaging effervescent sweetener tablets. Originally the allegations included a claim that Pillsbury had also violated trade secrets for the manufacture of such sweeteners, but the plaintiff abandoned that attack and proceeded at trial only with respect to the packaging techniques.

The plaintiff is a manufacturer and packager of food and drug items. It claims to have developed a successful process for packaging effervescent sweetener tablets so that their shelf life is lengthy. The production and sale of effervescent sweetener tablets is limited to a small group of companies; of the approximately 1000 tablet manufacturers in the United States, only a few produce this type of tablet.

Tidy House Corporation, the defendant's predecessor, had been interested in marketing an effervescent sweetener tablet. Prior to 1957, Tidy House had engaged several firms to manufacture tablets for this purpose. However, Tidy House experienced difficulties with each of these sources of supply, and in 1958 Tidy House learned that the plaintiff manufactured such tablets. In December, 1958, Tidy House sent its technical director, Mr. Egan, and his co-employee, Mr. Steinhauser, to observe the plaintiff's operation in New York. During that visit Mr. Lowey, the president of the plaintiff, claims to have disclosed to Mr. Egan what are alleged to be Forest Laboratories' trade secrets for packaging. Shortly thereafter, the plaintiff began to supply Tidy House with tablets in bulk; Tidy House packaged the tablets for the consumer.

In 1960, the Tidy House assets were purchased by the Pillsbury Company, and the plaintiff continued to supply the tablets to what became known as the Tidy House division of Pillsbury. This relationship continued until January, 1964, when Pillsbury engaged Formula-tions, Inc. as a new source of supply. Subsequently, the plaintiff brought this action, alleging that Pillsbury was using its confidential packaging secrets. In addition, the plaintiff charges that the defendant improperly disclosed such secrets to Mankato, Inc., a contract packager hired by Pillsbury in 1965.

The applicable law on trade secrets was set down in Abbott Laboratories v. Norse Chemical Corp., 33 Wis.2d 445, 147 N.W.2d 529 (1967). The court determined that the Restatement of Torts correctly states the Wisconsin law. In particular, the Abbott court ruled that there were two essential elements to a cause of action for misappropriation of trade secrets: there must be an actual trade secret and there must likewise be a breach of confidence. Each factor will be discussed in turn.

### A. ARE THESE "TRADE SECRETS"?

A trade secret is defined by the Restatement as

> "Any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a * * * process of * * * treating or preserving materials * * *." Restatement of Torts, § 757, comment (b).

The Restatement and Abbott set forth six factors to be considered in determining whether given information qualifies as a trade secret. These six factors are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be

properly acquired or duplicated by others.

The plaintiff contended at the trial that its packaging procedure consists of the following steps: (a) the entire packaging operation must take place in a room in which the relative humidity is maintained at 40% or less; (b) before packaging, the tablets are to be tempered in a room having 40% or less relative humidity for a period of between 24 to 48 hours; (c) before packaging, the bottles into which the tablets are to be packaged are to be tempered in a room having 40% or less relative humidity for a period of between 24 to 48 hours; (d) before packaging, the bottle caps are to be tempered in a room having 40% or less relative humidity for a period of between 24 to 48 hours; (e) before packaging, the cotton used to stuff the bottles is to be tempered in a room having 40% or less relative humidity for between 24 to 48 hours; (f) the bottles should not be washed; (g) an air space should remain in the bottles after the caps are applied.

The purpose of the foregoing procedure is to make certain that the tablets and the materials are dry and that they are in a state of equilibrium with each other. By using these techniques, the plaintiff asserts that it was able to produce and package a tablet with a high degree of stability. In contrast, the testimony shows that prior to the plaintiff's association with Tidy House, the latter had had difficulties with its prior suppliers whose products on occasion exploded on store shelves or otherwise proved unstable.

 Pillsbury denies that the recited techniques constitute trade secrets. To determine that issue, we will consider, seriatim, the six Abbott factors listed above.

(1) Pillsbury asserts that each step in the packaging procedure was well known in the trade, and that it cannot, therefore, qualify as secret material.

Pillsbury's expert witness, Dr. Wurster, a professor of pharmacy at the University of Wisconsin, testified that in his opinion these procedures were "just common knowledge". Professor Wurster prepared a compilation of textbook materials that he claimed set forth the procedures claimed by the plaintiff as trade secrets. (Def. exh. 1) This compilation makes references to the fact that effervescent tablets must be handled and packaged under controlled humidity conditions. Several of the articles refer to specific humidity levels; the references vary between 25% and 50%. The literature in evidence also contains admonitions that moisture must be kept out of the entire procedure. In addition, there was testimony that when Tidy House first became interested in effervescent tablets, it had been advised by The Du Pont Corporation that operations would have to be conducted under low (40%) humidity conditions to eliminate moisture.

The foregoing supports my conclusion that the industry was quite well aware of point (a) listed in the plaintiff's procedure: that packaging operations must be conducted under controlled humidity (40%) conditions. I am also convinced that steps (f) and (g), which relate to washing of the bottles and an air space above the cotton, likewise cannot be claimed to be trade secrets. There was testimony that others in the industry refrained from the practice of washing the bottles. Competitive products introduced into evidence clearly show that other producers utilized an air space above the cotton.

While Dr. Wurster thought that all of the plaintiff's procedures were well known, nothing that he said or compiled persuades me that the tempering steps, numbered (b), (c), (d) and (e) were known in the industry. On the contrary, the plaintiff's witness, Mr. Reamer, a fully qualified expert in the field, testified that the tempering steps were "new, intriguing. I think it's a breakthrough * * *" (Tr. 46) It was also his opinion that the defendant's compilation of literature did not set forth these procedures. (Tr. 46–47, 50)

Mr. Lowey testified that when he first became interested in effervescent tablets, he found that the literature on the subject did not teach him enough to package a stable tablet. It was only through trial and error, he averred, that he arrived at this process. As already noted, few firms engaged in packaging effervescent tablets, and those that did so often produced an inferior tablet. If proper techniques for packaging were broadly known, there would be little reason for this difficulty, unless the flaws stemmed from defective manufacturing practices.

The defendant asserts, however, that the tablet tempering stage [step (b)] is in the public domain because it is disclosed in the plaintiff's patent in suit. The argument is that under such circumstances plaintiff cannot claim this step as a secret. The patent (Pl. exh. 2) discloses the tablet tempering step. The general rule is that the issuance of a patent which clearly discloses all essentials of a process destroys any secrecy that previously attached to that process. Ferroline Corp. v. General Aniline and Film Corp., 207 F.2d 912 (7th Cir. 1953). However, if there is a wrongful use or disclosure prior to the issuance of the patent, the wrongdoer will not be absolved from liability for his wrong committed during that prior period. Engelhard Industries, Inc. v. Research Instrumental Corp., 324 F.2d 347 (9th Cir. 1963).

There is a decision in this circuit which holds that the wrongdoer may be permanently enjoined from use or disclosure even though the subsequently issued patent has made the information public. Shellmar Products Co. v. Allen-Qualley Co., 87 F.2d 104 (7th Cir. 1936). That rule has been severely criticized in other circuits. See, e. g., Conmar Products Corp. v. Universal Slide Fastener Corp., 172 F.2d 150 (2d Cir. 1949). On the other hand, once the plaintiff has issued a patent setting out the process, some courts hold that the disclosure in the patent precludes liability for use of the information subsequent to issue.

Schreyer v. Casco Products Corp., 190 F.2d 921 (2d Cir. 1951); Tempo Instrument, Inc. v. Logitek, Inc., 229 F.Supp. 1 (E.D.N.Y. 1964). The Shellmar case is often cited for the opposite conclusion. See Tempo Instrument, Inc. v. Logitek, Inc., supra.

In our case the confidential disclosure allegedly occurred in 1958; the improper use occurred in 1964 after Pillsbury discontinued purchases from Forest Laboratories. The patent was issued in March, 1965. There was an allegedly improper disclosure to Mankato, Inc. in May, 1965.

Since jurisdiction in this case is based upon diversity, Wisconsin law controls. However, the Wisconsin supreme court has not decided the instant question. In my opinion, the better rule is that which holds an improper use of a trade secret prior to the issuance of the patent to be an actionable wrong. This rule is in accord with the Restatement, which makes breach of faith an essence of the wrong. The plaintiff is not in a position to complain of a disclosure of the information occurring after his patent has issued. When the patent was issued, he dedicated his information to the public in return for a monopoly. To permit him to have both a monopoly and a cause of action for subsequent disclosure in inequitable. The plaintiff, in effect, has changed his position. Whereas he had previously kept this information secret (the *sine qua non* of a trade secret), he has now decided that it shall no longer be his knowledge alone. The key element of secrecy is gone. Therefore, Pillsbury cannot be held liable for any disclosure after March, 1965.

The improper adoption of steps (b) through (e), which were not well known in the industry, are actionable; on the other hand, steps (a), (f) and (g) were sufficiently well-known so that they cannot be called trade secrets.

(2) With reference to the second Abbott factor, the evidence discloses that only a handful of the plaintiff's employees knew of his packaging opera-

tions, and they were all bound by secrecy agreements.

(3) Mr. Lowey testified that all of his employees who deal with packaging were bound by secrecy agreements. There was also testimony that packaging information was closely guarded in the trade. (Tr. 46–47).

(4) The information would be of significant value to the plaintiff. Since technical problems prevent more than a few companies from packaging effervescent tablets, one who has the ability to do so is in an advantageous position.

(5) Mr. Lowey testified that he spent a long time developing and testing the process before he was able to devise a packaging procedure that insured stability. No exact time period was mentioned, however. There is no evidence as to the amount of money expended to develop the process. There is evidence that other firms in the industry hesitated to enter this particular field unless they had two years to test the stability of the product.

(6) This process is not so ingenious that it could not be duplicated by others; but invention is not the keynote of a trade secret under the liberal test of the Restatement. All that is needed is some procedure which gives an advantage over a competitor who does not have it. Restatement of Torts, § 757, comment (b).

▋ My conclusion is that the tempering portions of the packaging process must be classified as a trade secret. The Restatement test is not overly stringent. Even though a given procedure seems simple by hindsight, that is not conclusive. See A. O. Smith Corp. v. Petroleum Iron Works Co., 73 F.2d 531 (6th Cir. 1935), mod. on other grounds, 74 F.2d 934 (1935). A trade secret requires some process or method which is not obvious or generally known in the trade, and which gives the innovator a substantial advantage over a competitor. I find that the plaintiff has established the tempering process in connection with packaging as a trade secret.

## (B) WAS THERE A CONFIDENTIAL RELATIONSHIP?

The second issue presented is whether *these* trade secrets were given by Mr. Lowey to the defendant under circumstances which reveal that a confidential relationship existed between them.

▋ At the outset, Pillsbury argues that even if a confidential relationship as to these secrets was established with Tidy House, Pillsbury would not be bound unless it had actual notice of these facts. It bases its argument on § 758, Restatement of Torts. That section deals with situations in which a distinct third party receives confidential information without being aware of its secret nature; but that section does not apply to the situation at hand. In this case, Pillsbury purchased all the assets of Tidy House (Tr. 727), which thereafter became known as the Tidy House division of the Pillsbury Company. Most employees remained the same. In my opinion, Pillsbury, as successor, was bound by any confidential disclosure made to Tidy House. If Tidy House had notice that these secrets were confidentially disclosed, that knowledge does not end when the Tidy House personnel become Pillsbury employees. It does not matter, therefore, whether any member of the Pillsbury management actually received notice that the packaging information was a confidential trade secret.

▋ The testimony on whether this information was given to Tidy House in confidence is contradictory. It is my conclusion, however, that the plaintiff has established that there was a confidential disclosure to Tidy House employees in 1958.

When early arrangements were made with Tidy House, which was looking for a new supplier of effervescent sweetener tablets, Mr. Lowey sent the plaintiff's manufacturing formula to Mr. Sherrard, Tidy House's purchasing agent. The letter which conveyed this information said that the formula was to be kept confidential. (Pl. exh. 9) the letter also stated that "we agree with you that de-

tails on packaging, etc. should be taken up later". In December, 1958, Mr. Egan, the Tidy House technical director, and Mr. Steinhauser, Mr. Egan's associate, were authorized by Mr. Tieszin, the Tidy House Executive Vice President, to visit the plaintiff's facilities in New York. During that meeting, Mr. Lowey told Mr. Egan that Forest Laboratories did not want to package the tablets for the consumer because of a lack of space. (Tr. 112) Mr. Egan testified that he asked Mr. Lowey to give him "some advice as to the conditions under which this packaging should be carried on", (Tr. 113) because Tidy House had not previously packaged tablets. Both Mr. Lowey and Mr. Egan testified that Mr. Lowey agreed to furnish the packaging techniques in confidence. (Tr. 113, 495–96); both men also testified that all of the trade secrets were communicated orally to Mr. Egan, who took notes at such meeting. (Tr. 119–21, 498).

Mr. Egan testified that he then returned to Tidy House and both orally and in writing informed Mr. Sherrard, Mr. Tieszin, Mr. Williams, and "maybe" Mr. Rapp, the Tidy House President, that what he had learned at the meeting had been received in confidence.

Mr. Egan's written memo was never introduced into evidence, but Mr. Sherrard corroborated Mr. Egan's testimony by stating (Tr. 388–89) that although he did not remember seeing any memorandum, he did learn that the disclosure of packaging techniques to Mr. Egan had been made in confidence. Further, Mr. Egan's statement that he also informed Mr. Tieszin is uncontradicted.

Mr. Steinhauser, who accompanied Mr. Egan on the trip, testified that Mr. Lowey never cautioned Mr. Egan or himself that they were hearing confidential information. (Tr. 646) However, Mr. Steinhauser stated that the information disclosed was confidential on a "moral" basis. (Tr. 638–39). Mr. Rapp testified that neither Mr. Egan nor Mr. Steinhauser told him that any information given to them was to be kept in confidence. (Tr. 724); however, he also testified that he was never aware that any confidential relationship existed with the plaintiff (Tr. 728), and it is quite clear that a confidential relationship existed at least as to certain manufacturing information. (Pl. exh. 9, 33). Mr. Williams and Mr. McCarron also did not remember any statement that a confidential relationship existed. (Tr. 1008–09, 1233, 1253).

Although the foregoing proof is conflicting, I believe that the record establishes that a confidential relationship as to packaging information arose in 1958 between the plaintiff and Tidy House. Mr. Sherrard's testimony corroborates the testimony of the participants—Mr. Lowey and Mr. Egan. It is uncontradicted that Mr. Egan also reported this information to Mr. Tieszin. The contrary negative assertions of Messrs. Rapp, Williams, and McCarron do not convince me otherwise.

I have concluded that a confidential relationship as to "packaging information" was established in 1958, but Pillsbury argues that *tempering* secrets were not disclosed at that time. Both Mr. Egan and Mr. Lowey testified that such data was supplied, and they both detailed what those secrets were. I believe that tempering information was discussed at the meeting between Mr. Lowey and Mr. Egan; such conclusion is not reversed by Mr. Steinhauser's statement that he only remembers a discussion of manufacturing techniques. Pillsbury points out that Mr. Egan had testified at a deposition taken some months before the trial that the tablet tempering secrets were disclosed by Mr. Lowey during 1960 when Pillsbury's packaging facilities were being conducted at its Omaha facility (Tr. 218–21), and not at the 1958 meeting. Mr. Egan explained this discrepancy by saying that his recollection had been refreshed. (Tr. 219, 222). I find that the disclosure of the tablet tempering secrets was made in 1958, and thereafter Tidy House was under an agreement of confidence.

The defendant asserts that Mr. Lowey never formally reasserted after the 1958 meeting that the packaging techniques were trade secrets. While this may be true, the parties appear to have clearly *understood* that this was the case. Mr. Steinhauser, who met with Mr. Lowey in 1961, stated that while no specific admonition of secrecy was made at that time, "We had confidence in Mr. Lowey and I thought he had confidence in us and that is pretty much the way I recall it being handled." (Tr. 649). Mr. Boand, a Tidy House employee, also made a similar statement. (Tr. 656). Mr. Lowey testified that since a confidential relationship had been established in 1958, and since he was dealing with Tidy House employees or people who were under contract with them, he felt no need to reiterate what was already an established fact. (Tr. 588, 89). I do not believe that Mr. Lowey was careless in his dealings with the defendant.

The Restatement provides as follows: "The question is simply whether in the circumstances B knows or should know that the information is [the plaintiff's] trade secret and that its disclosure is made in confidence." Restatement of Torts, § 757, comment on cl. (b) at 14.

In regard to the tempering of materials, both Mr. Lowey and Mr. Egan stated that these steps were also disclosed in the meeting held in 1958. The defendant challenges this position and urges that the steps relating to the tempering of materials did not arise from Mr. Lowey but, instead, were the result of suggestions made by Mr. Pasternak of Magna, Inc. The latter company was hired in 1962 by Pillsbury to handle packaging.

The practice of tempering materials was utilized in 1962, but there was no reference to such procedures in the set of specifications which were composed when Pillsbury resumed its own packaging.

I conclude that the plaintiff has failed to satisfy its burden of proving that the tempering techniques as to materials (as distinguished from tablets) were its confidential trade secrets. While there are inconsistencies on both sides of the question, it is the plaintiff's burden to establish its case; in my opinion, it has failed on this point.

To entitle the plaintiff to recovery, it is only necessary that "some secret information relating to one or more essentials" belonging to the plaintiff has been misappropriated. Engelhard Industries, Inc. v. Research Instrumental Corp., 324 F.2d 347 (9th Cir. 1963). In my opinion, the information regarding the *tablet* tempering step constitutes essential and confidential information belonging to the plaintiff. Therefore, if it was misappropriated, the defendant will be liable to the plaintiff.

As already noted, however, since the plaintiff's patent was issued in March, 1965, that is the cut-off date for any wrongdoing by the defendant. This court need not, therefore, examine the alleged improper disclosure to Mankato in May, 1965.

### (C) WAS THERE A BREACH OF CONFIDENCE BY THE DEFENDANT?

The plaintiff has alleged a wrongful use of the tablet tempering information by the defendant subsequent to the time that Pillsbury dropped Forest Laboratories as its supplier in January, 1964. Pillsbury, on the other hand, insists that it made no use of this information after that time. I think the record fairly establishes that Pillsbury made use of the tablet tempering procedure after the plaintiff was dismissed as supplier of the tablets.

Pillsbury's confidential manufacturing specifications for these tablets, dated March 19, 1964, disclosed the following notation:

"Temper tablets 11805 in unopened supplier's containers for a minimum period of 48 hours. During temper-

ing, handling and packaging of tablets maintain environmental:

a. R.H. at 40%

b. Temperature of 70° F."

Dr. Stein of Pillsbury testified that the purpose of this type of requirement was "to allow the temperature of the tablets to equilibrate with the temperature of the room." (Tr. 912).

The defendant argues that this specification is different from the plaintiff's trade secret because the former specifies tempering in an "unopened" container. Mr. Dienst, the defendant's witness, testified that experiments showed that it would take much longer for tablets to equilibrate in a closed container than in a container open to the air. (Def. exh. 53). Other witnesses testified that the tablets would still equilibrate. (Tr. 54, 629–30).

█ In my opinion, the question of how long it would take the tablets to equilibrate is not controlling. An improper use need not be in exactly the same form as that contemplated by the plaintiff. Restatement of Torts, § 757, comment (b), p. 9. The only purpose of the tablet tempering procedure was to place the tablets in an ambient condition; that the defendant's method of utilizing this information may have been somewhat inefficient does not detract from the fact that the tablet tempering procedure was the plaintiff's secret and that it was improperly used by Pillsbury.

█ While the plaintiff has requested an injunction to prevent further use of the trade secret by the defendant, it is my opinion that such an injunction should not issue where, as here, the trade secret process has now been made public by the declarations made in the plaintiff's patent. Damages will suffice to compensate the plaintiff for its injury. But cf. Shellmar Products Co. v. Allen-Qualley Co., 87 F.2d 104 (7th Cir. 1936).

## II. THE INVALIDITY OF THE PLAINTIFF'S PATENT

The defendant, Pillsbury, has counterclaimed for a declaratory judgment that the plaintiff's United States patent number 3,173,797, issued on March 16, 1965, is invalid and not infringed by the defendant. Jurisdiction for this claim is based on 28 U.S.C. § 2201 and 28 U.S.C. § 1338. The plaintiff has stipulated on the record (Tr. 1572–73) that the defendant does not infringe the plaintiff's patent.

It is necessary to discuss the propriety of exercising jurisdiction to issue a declaratory judgment. The plaintiff's brief on this issue states that "It is within the discretion of the court to dismiss the defendant's counterclaim for a declaration of invalidity of plaintiff's patent because no actual controversy exists between the parties". This matter was before this court earlier, by way of the plaintiff's pre-trial motion to dismiss the defendant's counterclaim. By written decision dated September 20, 1967, this court denied that motion on the ground that a justiciable controversy existed within the meaning of the declaratory judgment act. The basis for that decision was that an action had been commenced in 1965 against Pillsbury in the federal district court for the southern district of New York. That action had charged the defendant with infringement of the same patent now before the court. The action was voluntarily dismissed without prejudice on April 19, 1967.

When the plaintiff's motion to dismiss this counterclaim was before this court, the plaintiff acknowledged by affidavit that the defendant's tablet manufacturing method did not infringe the plaintiff's patent. I nevertheless held that because of the earlier charge of infringement, a sufficient controversy existed within the meaning of the declaratory judgment act to give this court jurisdiction. Cf. Drew Chemical Co. v. Hercules, Inc., 407 F.2d 360 (2d Cir. 1969), where the court found that the

patentee never really evidenced an intention to sue.

▬▬▬ The only factor that has changed since my decision is that at the trial the plaintiff stated on the record that the defendant did not infringe the plaintiff's patent. Accordingly, the parties stipulated to a judgment of non-infringement, and that judgment should be granted. The statement on the record that there was no infringement does not divest this court of jurisdiction to issue a declaratory judgment. Whether a court has such jurisdiction is to be determined as of the time the suit was filed. Facts occurring after such time are not generally to be considered. American Needle & Novelty Co. v. Schuessler Knitting Mills, 379 P.2d 376 (7th Cir. 1967); Ortman-Miller Machine Co. v. International Basic Economy Corp., 138 U.S.P.Q., 108 (N.D. Ill. 1963); E. J. Brooks Co. v. Stoffel Seals Corp., 160 F.Supp. 581 (S.D.N.Y. 1958), rev. on other grounds, 266 F.2d 841 (2d Cir. 1959).

While I hold that this court has jurisdiction to determine the issue of validity, it is also my opinion that under the circumstances now present this jurisdiction should not be exercised.

The declaratory judgment act states that if proper jurisdiction is present, a district court "may" declare the rights of the parties. 28 U.S.C. § 2201. One court has stated that it is possible that the withdrawal of the charge of infringement after the case has begun may bear on the exercise of the court's discretion. Ortman-Miller Machine Co. v. International Basic Economy Corp., supra, at 109.

In this case, the patentee charged the defendant with infringement in 1965;

that suit was later withdrawn, allegedly because the plaintiff determined that the defendant did not, in fact, infringe the patent. The plaintiff has now reiterated that determination on the record in this action.

▬▬▬ There is a public interest in ascertaining whether a patent is valid or not. Phillips Petroleum Co. v. Shell Development Co., 6 F.R.D. 406 (D.C. Del. 1947). I am of the opinion that this court should not declare the rights of the parties under the existing circumstances. See McCurrach v. Cheney Brothers, 152 F.2d 365 (2d Cir. 1949), concurring opinion of Judge Clark.

## III. CONCLUSION

The plaintiff has established that the tablet tempering process was its trade secret; that it was given to the defendant in confidence; and that the defendant violated that confidence by using that process after Forest Laboratories was discharged as the tablet supplier. The other elements of the trade secret cause of action have not been established. The plaintiff is entitled to damages, but not to injunctive relief.

In addition, the court declines to exercise its jurisdiction to declare the rights of the parties in regard to the plaintiff's patent.

The foregoing constitutes this court's findings of fact and conclusions of law in accordance with rule 52, Federal Rules of Civil Procedure.

Counsel for the plaintiff are requested to prepare an order in accordance with this opinion. Said order may be presented to the court for signature, but not until it has been in the hands of defendant's counsel for at least 10 days.