ABBOTT LABORATORIES, Appellant, v. NORSE CHEMICAL
CORPORATION and others, Respondents.

*November 28, 1966—January 10, 1967.*

448

450

For the appellant there were briefs by *Whyte, Hirschboeck, Minahan, Harding & Harland,* attorneys, and *Victor M. Harding* and *Robert V. Abendroth* of counsel, all of Milwaukee, and oral argument by *Mr. Abendroth.*

For the respondents there was a brief by *Brady, Tyrrell & Bruce,* attorneys, and *Elwin J. Zarwell* and *Samuel J. Recht* of counsel, all of Milwaukee, and oral argument by *Mr. Zarwell.*

WILKIE, J. Consideration of the issues raised on this appeal must commence with an exposition of the nature

of the Abbott production process and of the Abbott customer list.

### The Abbott Production Process.

The production of a cyclamate is a chemical reaction which was originally embodied in the 1941 du Pont patent, and which became available to everyone in 1959. However, although the basic reaction was known, the methods of producing this product commercially had to be developed.

The basic production processes dealt with in development are purification, yield, and speed. Purification essentially deals with ways of removing water and other impurities as the reaction is taking place. The yield process involves an attempt to get a greater output from materials used in the reaction, and speed must be achieved in carrying out this reaction to make it economically profitable. Overall, the chemical engineering involved in formulating the entire process is attempting to achieve high production at lowest cost by dealing with these three essentials. Substitution of cheaper materials and equipment is made where feasible as part of the attempt to hold down costs.

### Customer List.

The Abbott marketing process was very costly and expensive to develop. In 1950, Sucaryl was virtually an unknown product and there were several important hurdles to be overcome. First, Abbott had to get sanction for the product's marketing for consumer use from the United States government. Then, Abbott also had to develop a market for its product among bottling companies, food producers, and drug companies. Often this involved substantial customer education in the use of an artificial sweetener, and Abbott sometimes assisted in the development of processes by other companies who used Sucaryl in their products.

Abbott's customer list essentially involved the names and addresses of Sucaryl users. The list also disclosed the name of a key individual in the organization who was familiar with artificial sweeteners and whom Abbott had educated in their use. Mueller had access to this list and the trial judge found:

"The Abbott customer list was used by the defendant Mueller in making up the Norse customer list and in soliciting Abbott's customers, but Abbott's customer list was not private, confidential or a trade secret."

On the question of liability a single issue is raised on this appeal. Do Abbott's technology and customer list constitute trade secrets so as to give rise to an unfair-competition action when wrongfully taken by the defendants?

This is a case of first impression in this state, there being no previous decisions by this court on trade secret protection.

The law of trade secrets has developed to deal with a particular problem in American industry—employee mobility among key employees of an industrial concern. In today's economy there is tremendous demand for highly trained technical, engineering, and research personnel. When an employee changes jobs, "it is inevitable that some of the employee's previously acquired knowledge will be made available to his new employer. It is at this point that the problem arises—where do the trade secrets begin and the employee's intellectual tools of the trade end?" [1]

Kalinowski sets out the basic factors of the problem as follows:

"There is no simple answer to this question. Its treatment at the hands of the courts has reflected a desire to balance the cross-currents of such social values as freedom of contract, personal economic freedom, and

[1] Kalinowski, Key Employees and Trade Secrets, 47 Virginia Law Review (1961), 583.

business ethics. Thus, the courts are reluctant to place any 'undue restrictions upon an employee's liberty of action in his trade or calling.' Nor will they require an employee who changes employers to 'wipe clean the slate of his memory.' On the other hand, their aim is to enforce 'increasingly higher standards of fairness of commercial morality in trade.'

"The public interest is likewise involved to a considerable degree. The basis of our industrial system is a free economy. The encouragement of technological advancement is vital to the maintenance of· our economic system and of our industrial productivity. On the one hand, it can be said that if the employer's trade secrets are not protected from appropriation by the employee or the unscrupulous, research and development will be impaired. No employer would be willing to spend large sums of money on research and development of new ideas, processes or methods if these can be taken and used by others with impunity. On the other hand, if potential competitors are intimated and the dissemination of ideas, processes and methods is impaired, competition is fettered and the public is injured. The courts have sought to balance these conflicting, yet fundamental, interests, but have done so with differing results." [2]

The law concerning trade secrecy developed as common law. The basis of the doctrine is an attempt to enforce morality in business. By its very nature, the trade-secrecy doctrine, under the heading of unfair competition, deals with an area that is nebulous as to the guidelines to be applied. However, the law features two basic themes.

The first theme was initiated by Mr. Justice HOLMES as the rationale for protecting trade secrets in *Du Pont Powder Co. v. Masland.*[3]

" . . . The word property as applied to trade-marks and trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith.

---

[2] Ibid.

[3] (1917), 244 U. S. 100, 102, 37 Sup. Ct. 575, 61 L. Ed. 1016.

Whether the plaintiffs have any valuable secret or not the defendant [a former employee] knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied but the confidence cannot be."

This philosophy has been adopted by the Restatement, 4 Torts, p. 5, sec. 757 *b*, as the basis for judicial protection of trade secrets.

Courts who emphasize the breach of confidence aspect of the law of unfair competition are essentially dealing with business morality. Usually, however, the cases involve a substantial breach of business ethics and an assumed trade secret. For example, in *Standard Brands Inc., v. U. S. Partition & Packaging Corp.*[4] the case involved drawings and patterns necessary to produce a process machine more efficient than any other in the industry. Key employees tried to steal these plans and encouraged other employees to join their enterprise. Defendants were able to switch most of the business of their former employer. Judge GRUBB of the federal court for the Eastern district of Wisconsin stated the law as follows:

" . . . In the absence of an agreement to the contrary . . . an agent is free to engage in competition with his principal after termination of his employment. Furthermore, he may plan and develop his competitive enterprise during the course of his agency provided the particular activity engaged in is not against the best interests of his principal. . . . Protection of the principal's interest requires a full disclosure of acts undertaken in preparation for entering into competition." [5]

In Judge GRUBB'S view the unlawful act was procuring the means to fashion the employees' enterprise by appropriation of their principal's property, and the fact that these machines could have been duplicated without reference to the drawings does not excuse the conduct.

[4] (D. C. Wis. 1961), 199 Fed. Supp. 161.
[5] Id. at page 171.

Another case to the same effect is *Franke v. Wiltschek* [6] in which the court states:

" . . . Plaintiffs do not assert, indeed cannot assert, a property right in their development such as would entitle them to exclusive enjoyment against the world. Theirs is not a patent but a trade secret. The essence of their action is not infringement, but breach of faith. It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is they did not. Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment." [7]

The second theme in the development of the law of trade secrets is the requirement of the existence of an actual trade secret as the *sine qua non* of a cause of action for unfair competition and even authority quoted by respondents recognizes this. [8] Whether employees are guilty of a breach of confidence often turns on the nature of the ideas and concepts which they take with them to their new jobs.

The trial court held that neither the technology nor the customer information constitutes a trade secret. The crucial question on this appeal is whether the trial court is incorrect in either determination.

We believe that the Restatement of the Law correctly states the general law of trade secrets. [9] It gives proper balance to the two factors that have cropped up throughout the development of the law of trade secrets. In de-

---

[6] (2d Cir. 1953), 209 Fed. (2d) 493.

[7] Id. at page 495.

[8] *McGraw-Edison Co. v. Central Transformer Corp.* (8th Cir. 1962), 308 Fed. (2d) 70; *Van Products Co. v. General Welding & Fabricating Co.* (1965), 419 Pa. 248, 213 Atl. (2d) 769; *Tom Lockerbie, Inc., v. Fruhling* (E. D. Wis. 1962), 207 Fed. Supp. 648; *Heyman v. AR. Winarick, Inc.* (2d Cir. 1963), 325 Fed. (2d) 584. Also see 77 Harvard Law Review (1964), 890, 948.

[9] Restatement, 4 Torts, p. 5, sec. 757.

fining a trade secret, in comment *b* the Restatement states:

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." [10]

And further states:

"A trade secret is a process or device for continuous use in the operation of the business." [11]

An indispensable feature of a trade secret is that

"The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible." [12]

It is on the lack of this essential that Abbott's claim of a trade secret in either its technological process or customer list fails and thus Abbott has no basis for an unfair-competition action in either respect.

We now proceed to a detailed analysis of whether Abbott enjoyed trade-secret status as to either its production technology or customer list.

---

[10] Id. at page 5.
[11] Ibid.
[12] Ibid.

*Abbott's Production Technology.*

The essentials of the Abbott process for producing cyclamates were discussed at length, and we think accurately, by the trial court.

"Abbott concedes that its confidential technology does not include the chemistry of cyclamate; that is, the chemical formulas and transformations which produce cyclamate. Therefore, anyone may legally go into the business of manufacturing cyclamate in competition with Abbott or anyone else using the basic chemicals of sulfamic acid and CHA.

"The answer to the above question can be reached only if we analyze the so-called vital elements of Abbott's cyclamate technology. They are in substance as follows:

"(1) Water Tolerance (Stage A, Exhibit No. 120). This know-how consists of use of the knowledge that small amounts of water, not to exceed 0.25 to 0.3 per cent, can be tolerated in the reaction to form the double salt. Application of this know-how avoids the time and expense involved in removing the last gallons of water from CHA.

"The testimony was that the above-mentioned tolerance is a comparison of calculations known in the chemical engineering field. Dr. Rushton testified that it is a generally known fact to chemical engineers that it is more costly to remove the last traces than an equivalent amount from a solvent with more water; that the reaction of sulfamic acid with water would be known and a chemical engineer could calculate the amount of sulfamic acid that would be destroyed by water present and used up in the side reaction.

"(2) Solvent (Stage B, Exhibit No. 120). This know-how consists of the use of CHA, despite many undesirable characteristics including its high cost, as the most effective solvent, and the use of approximately three extra parts of CHA as solvent for optimum results in production scale equipment.

"The use of CHA in excess as a solvent is specifically advised in Abbott's British patent: 'About 440 parts by weight (4.35 moles) of cyclohexylamine is put into a reaction vessel . . . 97 parts (1 mole) of sulfamic acid are added slowly.' (Exhibit No. 47, page 3, lines 29–35).

"(3) Pressure (Stage B, Exhibit No. 120). This know-how consists of use of the knowledge that increasing the temperature and hence the speed of this specific reaction by pressure will not speed up proportionally side reactions so as to create impurities which cannot later be easily removed.

"The testimony disclosed that Norse does not use pressure. The record also shows that pressure is known to speed reactions and known in the cyclamate field. The expert witnesses are in agreement that pressure is a well known method of causing the temperature of a reaction proceeding at reflux to increase and to thereby cause a speed up of the reaction.

"(4) Separation of the Double Salt (Stage C, Exhibit No. 120). This know-how consists of use of the knowledge that evaporation completed under vacuum is the most desirable technique to separate the double salt from the solvent.

"The expert Dr. Rushton testified that the removal of CHA by vacuum distillation is a disclosed process in the U. S. patent.

"(5) CHA Removal in Hydrolysis (Stage E, Exhibit No. 120). This know-how consists of use of the knowledge that evaporation of the liberated CHA at this point, despite the 'bottleneck' created by this long and costly procedure which leaves the cyclamate in solution, is the most effective technique. This know-how further consists of use of steam injection to carry out the evaporation and the use of a 'sidearm sparger' for the injection of steam.

"The German patent No. 874309 (Exhibit No. 48, translation page 5, paragraph two) expressly discloses the above technique. The sidearm sparger referred to is not used by the defendant Norse and the witness Dr. Rushton described a sidearm sparger as a common method.

"(6) Recovery of CHA (Stages C and E, Exhibit No. 120). This know-how consists of use of the knowledge that the most effective recovery method of CHA from condensed vapors are either by attracting the impurities, water, to caustic soda or removal of CHA by attracting the CHA to benzene and thereafter separating the CHA from benzene.

"Both recovery means are well known. The fact was established that the recovery system used by Norse,

requiring benzene extraction, is different than the recovery system used by Abbott, requiring caustic soda separation. Abbott's experiments resulted . in the conclusion that benzene recovery is not usable in a production setup, while the testimony established that Norse is using that system in a production setup.

"(7) Neutralizing Acids (Stage F, Exhibit No. 120). This know-how consists of use of the knowledge that the most effective neutralizing acids are hexamic, acetic or citric acid.

"It was admitted by the testimony of the witnesses Rushton and Smutney that these neutralizing acids are published and known.

"(8) The Purification Procedure (Stages F through K, Exhibit No. 120). This know-how consists of use of several interrelated functions which depend in large part upon knowledge of the nature of the impurities, as follows:

"(a) The point in the process, after neutralization, when the most effective and economical purification can be made.

"(b) The particular purification sequence utilized; namely, neutralization, primary filtration, concentration, secondary filtration, crystallization, and final filtration.

"(c) The use of massive amounts of activated carbons as haze adsorbents and the knowledge that two specific adsorbents, Nuchar C 190N and Norit A, are especially effective.

"(d) The operating conditions under which the primary and secondary filtrations take place. Especially in secondary filtration, it is important that the temperature of the solution be cooled to a point near the crystallization temperature. The specific batch temperature will vary, depending upon the thickness of the solution, et cetera. But to remove haze effectively, there must be a cooling to a point close to the crystallization temperature. This principle applies equally well to the primary filtration, although it is not as essential to approach the crystallization temperature. A cooling from boiling point to about 80 degrees Centigrade here is practiced.

"(e) A short water wash of the crystals rather than a methanol wash. The saving accomplished by use of a water wash reflects the effectiveness of the purification to that point.

"The known character of this sequence is reflected in the record. The use of massive amounts of activated carbons is shown by the German patent No. 1161263 (Exhibit No. 133) issued to Abbott's subsidiary for the manufacture of cyclamate. It reflects the use of 10 grams of fresh activated charcoal in purifying the first crop solution in the described run which uses 100 grams of sulfamic acid. Abbott uses 200 pounds of fresh charcoal for 2,000 pounds of sulfamic acid. The ratio as shown by the German patent and Abbott's production run is identical at 10 per cent.

"The record also indicates the use of charcoal until the filtrate is clear. Abbott and Norse practice this. Norse adds its charcoal at a different time and place and uses only 129 to 161 pounds of a different fresh charcoal as against the 200 pounds used by Abbott.

"Counsel for plaintiff introduces the point of the use of Nuchar C 190N or Norit A as specific adsorbents for filtration. Norit A was not mentioned in the original points of confidentiality in Exhibit No. 119. Braaten testified that Norse used neither charcoal.

"The point of final washing of the crystals is not significant. The witnesses find this to be the natural wash to use.

"With respect to the filtration control temperature of 80 degrees Centigrade to approach the crystallization temperature in filtration, the testimony disclosed that Abbott uses a crystallization temperature of between 65 and 80 degrees Centigrade or between 65 and 70 degrees Centigrade, indicating that the control temperature for filtration would vary with the crystallization temperature of the particular batch.

"The testimony also disclosed that a temperature for filtration above that of initial crystallization temperature is needed as a physical requirement to keep the filter pipes and pumps from clogging. It was also disclosed that Norse does not use a filtration control temperature.

"(9) Scale Up. Essentially this is the know-how required to convert or scale up a laboratory chemical process to a workable commercial production procedure.

"Abbott claims confidential know-how under the heading 'Scale Up.' However, the record discloses by the testimony of the experts that scale up is applicable to

specific pieces of equipment except in a very general sense. Scale up is the general function of a chemical engineer and applies directly to the equipment involved, not only being related to that equipment but being specific to that equipment. It is an unusual claim that general knowledge of scale up and the manner by which a chemical engineer proceeds to accomplish scale up directed to particular equipment can be confidential or constitute a trade secret.

"The witness Mr. Hansen, who was in charge of scaling up processes for Abbott, testified it was a relatively simple task. There is no proof that there was any taking or any use of any design information which would normally fall within the so-called scale up area.

"The record shows that the equipment in the plants of the two companies is somewhat different. Abbott did not disclose all its equipment in the record but the equipment disclosed differs from the Norse equipment. Abbott's reactor is a coil heated 316 stainless steel reactor. Norse's reactor is a 304 stainless steel jacket heated reactor. The agitation system in the Abbott reactor was not disclosed but the agitation in the Norse reactor was shown to be home-made and of a different type. The piping and valving system in the condensing setup was different. Abbott used a sidearm sparger. Norse used steam injection from the bottom of the reactor for the hydrolysis step. The Norse reactor was connected to a solvent recovery system using benzene. The Abbott reactor was not so equipped since Abbott used a sodium hydroxide system for CHA recovery. The record also discloses many other variations between the different types of equipment used by the parties.

"Abbott's claim of the existence of trade secrets in the areas of manufacture and sales cannot be sustained. In order to constitute a trade secret protectible by injunctive relief, Abbott had the burden of showing a formula, process, or compilation of information known only to Abbott or its employes to whom it was necessary to confide in secret.

"Here the alleged trade secrets were published and were commonly known in the trade and readily discernable in the chemical engineering field. In the area of manufacture the defendants have utilized the basic chemistry for a basic process consisting of a series of well known steps published by Abbott. There was no showing that the de-

fendants copied any plans or took any drawings, designs, specifications, or specific details from Abbott. The testimony established the fact that the defendants expended substantial time, money and effort in their own plant."

Each element in the entire process is based on chemical engineering know-how. Braaten was intimately associated with the cyclamate process and testified that he knew how to make cyclamates. This knowledge came from working with the process, applying different engineering techniques at its various stages, and being aware of the outcome. This kind of information can be more accurately titled know-how or skill which cannot be blotted out of an employee's mind and cannot be labeled a trade secret.

There is no showing that Braaten took any plans or diagrams of the process or the way in which it worked. The trial court found that Braaten developed the Norse pilot plant and the Norse operation through a substantial input of time, labor, and money. Of course, Braaten had certain knowledge of particular engineering techniques which could be applied at a given point more advantageously than another technique. This, however, was a result of his training and experience in dealing with cyclamates in his profession, rather than a direct copying of the Abbott process. Production of cyclamates was Braaten's business and the skill and knowledge he possesses from being in this business should inure to his benefit.

In discussing the definition of a trade secret, the Restatement, Torts, states that:

" . . . Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to

him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." [13]

Abbott's claim of trade secrecy in its technological process is discounted by deficiencies under elements (1), (3) and (6).

Appellant relies on the *Sperry Rand Case* [14] in support of its contention that the defendants were guilty of unfair competition in connection with the taking of knowledge concerning the Abbott technology. But in *Sperry Rand* the court found that the plaintiff's process utilized unique and unusual steps which it found were trade secrets. [15] While the trial court in *Sperry Rand* found

---

[13] Restatement, 4 Torts, p. 6, sec. 757, comment *b*.

[14] *Sperry Rand Corp. v. Rothlein* (Conn. 1964), 241 Fed. Supp. 549.

[15] *Vitro Corp. of America v. Hall Chemical Co.* (6th Cir. 1958), 254 Fed. (2d) 787, involved a unique process with a written agreement by defendant limiting the use of disclosed information. *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. (2d) 379, 212 N. E. (2d) 865, in which the court found that there were approximately 15,000 drawings of various types involved and that defendants' own expert witness looked doubtfully upon the ability of any engineer to make accurate drawings of many of the delicate parts merely by measurement of the parts, particularly as to those parts where the measurements were $1\%000$ths of an inch. The court pointed out that to come up with the identical measurements, tolerances, etc., that appear on the Time-O-Matic drawings was almost impossible. The Illinois supreme court affirmed, stating that for these reasons trade secrets did, in fact, exist. In *Ferranti Electric, Inc., v. Harwood* (1964), 43 Misc. (2d) 533, 251 N. Y. Supp. (2d) 612, 617, also relied on by appellant, the court states: "There certainly were refinements achieved by Ferranti through the years, but not one of these impresses the court as being so unique or esoteric as to merit 'trade secret' status." Of the refinements in the process claimed to be trade secrets the court concluded: "In short, they are refinements, but they do not possess that special characteristic which represents a substantial, novel, important or significant improvement in the art." Citing *Sarkes Tarzian, Inc., v. Audio Devices, Inc.* (D. C. Cal. 1958), 166 Fed. Supp. 250, 265.

that the various items of Sperry Rand's process were not disclosed, here the trial court found such disclosure. While the court in *Sperry Rand* found almost absolute duplication of the Sperry Rand process down to the tiniest fraction of an inch, there was abundant evidence here that the Norse equipment differed from that used by Abbott. Then, too, in *Sperry Rand* there were gross abuses by the defendants who were able to divert substantial business from Sperry Rand and to take many of its employees.

Although at present Abbott is the unquestioned leader of the cyclamate field, to give trade-secret status to the Abbott technology, and to prevent the development of Norse as a competitor would inhibit the free enterprise system and the freedom of employees to use their own knowledge and skill.

### Customer Lists.[16]

The customer list is not a trade secret. The customer lists taken by Mueller were not complicated marketing data which had been laboriously compiled by Abbott. These cards contained only the names and addresses of the customers and the individual to be contacted. There was no complicated marketing data concerning projected market needs of the customer or the customer's market habits. Moreover, the trial court found that a policy of confidentiality was not invoked by the company as to these customer lists. Both of these factors mitigate the classification of the lists as a trade secret.

Supporting this finding are the factors shown by the record that: (1) Customers of artificial sweeteners are

---

[16] For a general discussion on the limitations of customer lists as trade secrets, see Unfair Competition—Customer Lists Not Trade Secrets, 13 University of Miami Law Review (1959), 483. Also see Justifying Relief in California Customer List Litigation, 37 Southern California Law Review (1964), 112.

almost common knowledge in a household, and more so in the cyclamate industry. (The customer list could practically be obtained from any trade directory.) [17] (2) Abbott engaged in an advertising campaign which publicized the users of cyclamates, and these publications were available for public distribution. [18] (3) Federal regulations required that cyclamate users put this fact on their product labels, and Abbott encouraged its users to use the trade name Sucaryl on the labels. All of these facts are grossly inconsistent with a policy of confidentiality or trade secrecy. [19]

[17] *Edwin L. Wiegand Co. v. Harold E. Trent Co.* (3d Cir. 1941), 122 Fed. (2d) 920, 924.

[18] The rule is stated in 2 Callmann (2d), Unfair Competition and Trade-Marks, page 842, sec. 55.2 (c) (2) (*b*): "Those names and addresses of the employer's customers which are readily acquired either through simple observation or the use of public directories are not confidential or secret information or material, exclusive to the employer. The obvious cannot be secret. Thus, 'every man, woman and child knows that barbers, butchers, bakers and grocers use white coats, aprons and towels.' "

[19] In *Skoog v. McCray Refrigerator Co.* (7th Cir. 1954), 211 Fed. (2d) 254, plaintiffs' alleged secret was a method of arranging a freezer cabinet to permit display of frozen foods and public self service. Defendant procured pictures of the secret by making a false offer to purchase. The court refused to protect plaintiffs' secret, however, saying, at page 257: "We think it well established that there can be no confidential disclosure where there has been a prior disclosure to the public without reservation." The cabinet was in "close proximity to anyone entering the store" and was in unrestricted public use in plaintiffs' store. In *Tom Lockerbie, Inc., v. Fruhling, supra*, footnote 8, at page 656, the trial court determined that the subject matter of the claimed trade secret "was fully and publicly disclosed in Lockerbie's trade literature during the course of Dunckel's employment with plaintiff. . . . There can be no recovery for alleged misappropriation unless the claimed trade secret was in fact secret and confidential." In *Van Products Co. v. General Welding & Fabricating Co., supra*, footnote 8, at page 263, the court said: "As with any other trade secret, for customer information to be protectible it must be a particular secret of the business, of value to the employer and wrongfully appropriated by the employee. In the present case, the actual lists

A further factor in the nature of the Abbott customer list detracts from any designation of that list as a trade secret. This is the route-nonroute distinction. A nonroute customer is one whose demand varies, and who is likely to purchase from several suppliers. Courts have been less prone to give relief in this area because there is no particular relationship developed between a customer and a salesman which is enduring. Thus, contact of a customer by a former employee is not as unfair as in the area of a route salesman whom customers know and have come to depend on. Both Abbott's and Norse's customers are nonroute in that their customers are not retail customers, they buy on price and quality, they appear in various trade publications, they disclose through labeling who they are, and the appellant publishes their identities.

Customer lists are on the periphery of the law of unfair competition,[20] because legal protection does not provide as much incentive to compile lists and because most are developed in the normal course of business anyway.

" . . . Written customer lists generally have been regarded as trade secrets when the nature of the industry permits the list to be kept secret and the list cannot readily be duplicated by independent means. The size of the list and the type of information it contains about the customers may be relevant to the latter determination, as may the amount of time and effort which went into its composition." [21]

were merely distillations of commercial lists created from the very general knowledge that users of compressed air are potential customers for air driers. In this respect, these customer lists are in no way secret." The court continued, at page 268: "While recognizing that limited publication and experimental usages are not incompatible with secrecy, we feel that the widespread publication and advertising in this case and the public sale of the air driers destroyed Van's right to maintain a cause of action upon a breach of duty not to disclose its 'trade secrets.' "

[20] 77 Harvard Law Review (1964), 890, 955.
[21] Ibid.

An examination of the character of the lists and the availability of the lists to the public substantiates the trial court's theory that a finding of confidentiality is requisite to a trade secret.

Abbott argues that it spent substantial time and money on its customer list. In reality that time and money was spent on the development of the market which the customer list represents. Norse is only attempting to sell to this market and Abbott's customer information, in view of its public nature, should not be protected to prevent such competition.

### Restitution.

Plaintiff also makes an argument that defendants should be liable in damages for the value of Abbott's cyclamate production and marketing know-how which they have used. Unjust enrichment, however, requires a wrongful taking or appropriation of others' property to one's own use.[22] In view of the fact that no trade secrets were appropriated by the defendants, there was no unjust enrichment and plaintiff is not entitled to restitution.

Respondents make a motion for the taxation of double costs against appellant under sec. 251.38 (2), Stats. That motion is denied.

*By the Court.*—Judgment affirmed. Respondents' motion for taxation of double costs denied. Simple costs on this appeal to respondents.

HANLEY, J., took no part.

---

[22] *General Accident Fire & Life Assur. Corp. v. Bergquist* (1961), 15 Wis. (2d) 166, 111 N. W. (2d) 900.