**MAJOR MAT COMPANY,**
Plaintiff–Appellant,

v.

**MONSANTO COMPANY,**
Defendant–Appellee.

No. 91–3639.

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 1992.

Decided Aug. 5, 1992.

John K. Brendel (argued), Brookfield, Wis., for plaintiff-appellant.

William H. Levit, Jr., Michael B. Apfeld, Michael Ash (argued), Godfrey & Kahn, Milwaukee, Wis., for defendant-appellee.

Before BAUER, Chief Judge, RIPPLE, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

BAUER, Chief Judge.

In this diversity action, Major Mat Company ("Major Mat"), a manufacturer of golf tee mats, appeals from the district court's entry of summary judgment against it in favor of Monsanto Company ("Monsanto"), its source for the principal component of the mats. For the following reasons, we affirm.

## I.

Among the products Monsanto manufactures is a particular variety of artificial turf, S–54 AstroTurf, that it installs on athletic playing fields. The S–54 artificial surface is uniquely Monsanto's. During the time period relevant to this inquiry, after fulfilling its athletic field installation contracts, Monsanto annually would be left with between 100,000 and 300,000 square feet of S–54 remnants. Having no use of its own for these remnants, Monsanto sold them for use by others at $1.75 per square foot.

Leon Storm has a background that includes experience in running golf driving ranges. Dissatisfied with commercially available golf tee mats, Storm experimented with various materials hoping to construct a more sturdy mat. In the fall of 1982 he purchased a quantity of S–54 remnants from Monsanto. With it, he fabricated a golf tee mat that he felt was far superior to anything already on the market. He tested it on his driving range in Florida, and others agreed with his assessment. The *Clearwater Sun* gave the mat a full write-up, claiming it excelled. Two things occurred next, and their sequence is unclear from the record: the business moved to Wisconsin, and Storm, Tom Major, and two others formed a partnership, Major Mat. They then went into production, placing several orders for S–54 with Monsanto in rapid succession. Because only S–54 produced the desired results, Storm thought it would be wise to ensure a continuous supply by entering into a contract with Monsanto. In April 1983, Storm asked Lynda Smith, the remnant salesperson with whom he had been dealing, who he should talk to about a contract for S–54. She referred him to Douglas Fleck. Fleck's primary responsibility at Monsanto was to administer the installation contracts for artificial turf, but he also was in charge of remnant sales.

Before Storm followed up, Fleck called him in June. He was curious about what Major Mat was doing with all the remnants it purchased because, he said, Monsanto had a constant need to sell them and was always looking for an outlet for them. He said other purchasers included contractors who install playgrounds for McDonalds. Storm was reluctant to tell Fleck how Major Mat used the remnants, but did inquire if Monsanto would enter into a contract with Major Mat for the purchase of Monsanto's entire remnant supply.

> He said to me, Mr. Storm, we have so many remnants there's no way you could buy our entire supply of remnants. I, then, said to him, well, I'm concerned with keeping a constant supply of remnants because we are going to be doing what we're doing in large numbers. He said, well, wonderful, you can rest assured that we will have an unending supply of remnants.

Storm Deposition ("Dep."), at 10–11. Only then did Storm tell Fleck that Major Mat used the remnants in the production of golf tee mats, and noted that he hoped Monsanto wouldn't manufacture its own mats. Fleck responded not to worry, Monsanto is a supplier of products, not a fabricator. Both apparently were satisfied that this telephone call settled each of their concerns because neither followed up with a written communication. For his part, Storm understood Fleck to have promised that Major Mat could purchase its S–54 requirements at the remnant price of $1.75 per square foot in perpetuity, and that Monsanto would not compete with Major Mat in the golf tee mat market. He also believed, as a result of this conversation, that the onus was completely on Monsanto—Major Mat was under no obligation to make any purchases of S–54.

Major Mat continued to purchase large quantities of S–54 from Monsanto, and enjoyed commercial success with its golf tee mat. The partners, however, continued to be concerned about the supply of S–54. During a telephone conversation between Major and Fleck sometime in the fall of 1983 or early in 1984, Major again sought reassurance of the continued availability of S–54. Fleck told Major not to worry, they always had plenty, but even if they were to run out of remnants, Major Mat could purchase newly milled carpet. So all was well for several years.

Things changed. In July 1985, Major learned from a customer that Monsanto was about to market its own golf tee mat. He contacted Lynda Smith and asked what she knew about this development. She knew nothing about it, but said she would ask Fleck if he knew anything. After she talked to Fleck, Smith called Major to report that Fleck also knew nothing about Monsanto developing its own mat, and suggested that it must be a mistake. In January 1986, however, at the P.G.A. show in Orlando, Florida, Major learned that it was no mistake. Monsanto had its own golf mat.

Also in January 1986, Monsanto formed a wholly owned subsidiary, AstroTurf Industries ("AstroTurf"), based in Dalton, Georgia. AstroTurf assumed the manufacture of Monsanto's artificial turf products, including its golf tee mat line. At a slow but steady pace, the quantity of S–54 remnants available to Major Mat began to decrease. On one occasion, all that was available was blue S–54, not the standard green. On another, all Major Mat could purchase was S–64, which, although it was the preferred green color, was of a lesser quality for Major Mat's purposes. Eventually, the quantities of S–54 that Major Mat needed simply were unavailable. Major Mat continued to press for a contract. Ultimately, on September 10, 1986, AstroTurf's Vice President, Ed Milner, wrote to Major Mat to offer first-run S–54, at $4.00 per square foot, for a minimum quantity of 50,000 square feet per year for at least three years. But that would have resulted in a doubling of the price of Major Mat's product to its customers, and competing against the Monsanto mat manufactured at almost a quarter of the cost. Major Mat refused to accept those terms.

Without the necessary S–54 artificial turf, Major Mat ceased production. Consequently, it could no longer take new orders for mats and, in effect, went out of business. On April 2, 1987, Major Mat filed a complaint against Monsanto in the Circuit Court of Waukesha County, Wisconsin. Monsanto timely removed the case to the United States District Court for the Eastern District of Wisconsin and then moved to dismiss the complaint. In response, Major Mat filed an amended complaint containing seven separate theories of recovery: (1) promissory estoppel; (2) misrepresentation; (3) conspiracy; (4) violation of the Wisconsin Fair Dealership Law; (5) federal racketeering; (6) state racketeering; and (7) unjust enrichment.

After both sides conducted thorough discovery, Monsanto moved for summary judgment. On October 11, 1991, the district court granted Monsanto's motion in an opinion delivered from the bench. Major Mat filed a timely notice of appeal. It argues that the district court erroneously entered summary judgment against it on its promissory estoppel, misrepresentation, and unjust enrichment claims.

## II.

To succeed on a motion for summary judgment, the movant bears the burden to identify for the court, from among all the material of record, the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); FED. R.CIV.P. 56(c). This court reviews *de novo* a district court's grant of summary judgment, drawing all reasonable inferences in favor of the nonmoving party. *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990).

■ Major Mat claims that Douglas Fleck's statement to Leon Storm in the June 1983 telephone conversation that "you can rest assured we will have an unending supply of remnants" constituted a promise on which Major Mat relied when it went into golf tee mat production. It argues that because it raised genuine issues of material fact regarding all of the elements of promissory estoppel, the district court erroneously entered summary judgment against it. In Wisconsin, to prevail on a theory of promissory estoppel a plaintiff must show (1) that the promise was one that the promisor reasonably should have expected would induce action or forbearance of a definite and substantial character on the part of the promisee; (2) that the

promise did induce the required action or forbearance; and (3) that injustice can be avoided only by enforcing the promise. *Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 133 N.W.2d 267, 275 (1965). The first two elements are questions of fact ordinarily resolved by a jury, and the third a question of policy left to the court. *Id.* So our first inquiry is was there a promise, one which Monsanto reasonably should have expected would induce Major Mat to take action or forbear from doing so.

■ A promise is a manifestation of intent by the promisor to be bound, and is to be judged by an objective standard. RE-STATEMENT (SECOND) OF CONTRACTS § 2, cmt. b (1981 rev. ed.). Mere predictions or statements of opinion are not promises supportive of a promissory estoppel cause of action. *Werner v. Xerox Corp.*, 732 F.2d 580, 583 n. 1 (7th Cir.1984). Whether a reasonable person in the position of the plaintiff would conclude that the defendant's statement was a commitment or a mere prediction is a question of fact for a jury to resolve—unless the court rules that reasonable people could reach only one reasonable conclusion. *Construction Aggregates Corp. v. Hewitt–Robins, Inc.*, 404 F.2d 505, 509 (7th Cir.1968), *cert. denied*, 395 U.S. 921, 89 S.Ct. 1774, 23 L.Ed.2d 238 (1969).

■ We find as a matter of law that reasonable people could conclude only that Fleck's statement was a mere expression of opinion or prediction concerning the future availability of S–54 remnants based upon his immediate experience in the sale of those remnants. Monsanto had anywhere from between 100,000 to 300,000 square feet of remnants annually while Fleck oversaw remnant sales. Fleck Dep. at 10. No one could predict exactly how much excess Monsanto would have because the company milled the artificial turf in January for installation on playing fields during the summer. *Id.* at 8–9. The result was a lack of precision in forecasting the amount of S–54 required to meet its contracts. *Id.* at 9. Thus the 100– to 300,000 square feet of remnants, which was somewhere in the

neighborhood of ten to fifteen percent of production. *Id.* at 10. Although Monsanto had no concerted program to sell its S–54 remnants, *id.* at 10, it would sell them to willing purchasers. Storm Dep. at 10. In his conversation with Storm, Fleck did not guarantee a never-ending supply of S–54, Fleck Dep. at 68. In fact, when pressed about the continued availability of S–54, Fleck explained how the product is milled, how that produces large amounts of remnants,

> and for the time being with present technology that's the way it's going to be, and as long as it is that way, there's going to be that material there, but—and I let people draw their own conclusions as to the inevitability of that turf always being there but I never tried to convince anyone that it was going to be that way forever.

*Id.* at 73. Indeed, Fleck told Tom Major that historically Monsanto had an over-abundance of remnants, probably more than Major Mat could use. Major Dep. at 46 & 47. But, if it happened that Monsanto ran short of remnants, its mills could produce first-run S–54 that it would sell to Major Mat. *Id.* at 44. The sum and substance of Fleck's statement to Storm in the June 1983 telephone call, therefore, was a prediction of future availability of S–54 based on his knowledge of past availability. There was no promise.

So our next question is whether a reasonable person in Major Mat's position would have concluded that Monsanto made a promise. We conclude that reasonable minds could reach only one conclusion: it did not. First Storm, then Major, heard only what they wanted to hear, not what Fleck was telling them: it was his opinion, based on several years' experience selling remnants, that there would be plenty of S–54 for their purposes.

Assuming for the moment that Monsanto did make a promise, however, Major Mat fails to show how Fleck's statement induced action or forbearance. "In the case of action in reliance ... the promise comes first and induces the subsequent action in reliance." 1A ARTHUR LINTON CORBIN, CON-

TRACTS § 196 (1963 ed.). Moreover, that action or forbearance must amount to a substantial change of position. *Id.* at § 200. Major Mat claims that its action in reliance was commencement of production of its golf tee mats and development of a market for their sale. Storm's deposition testimony shows this argument to be specious. Flushed with pride over the quality of its product and the high praise it received from the *Clearwater Sun,* Major Mat moved to Wisconsin and began production of its mats. It then placed several orders for quantities of S–54 "in rapid succession." Storm Dep. at 9. All of this occurred *before* the June 1983 telephone conversation between Fleck and Storm. *Id.* It is clear that Major Mat was a functioning concern before Fleck's alleged promise. Because only S–54 satisfied Major Mat's needs, and was available exclusively from Monsanto, Fleck's statement had nothing at all to do with Major Mat's continued purchase of S–54 remnants. Further, not only was Major Mat not induced to act, it is significant that Tom Major understood after his conversation with Fleck that the company was under no obligation of any kind to purchase any quantity of S–54. Major Dep. at 50.

On these facts there is no basis for imposing a contract on Monsanto. The essence of a contract is agreement. The parties here, however, never entered into an agreement for the perpetual sale of S–54 to plaintiff at remnant prices. Indeed, Monsanto declined Major Mat's offers to contract. Major Mat's promissory estoppel cause of action is simply an attempt to force a requirements contract on Monsanto on its own terms, in perpetuity. This is neither a proper use, nor case, for the doctrine of promissory estoppel.

### III.

■ Major Mat's next argument is that the district court erroneously entered summary judgment against it on its misrepresentation cause of action. It bases its claim on Fleck's statements to both Storm and Major that Monsanto had a limitless supply of S–54 remnants and it was not a fabricator of products, and Lynda Smith's statement, in response to Major's inquiry, that Monsanto was not developing its own golf tee mat. To succeed on this claim, Major Mat must show (1) that Monsanto made a representation of fact; (2) that the representation of fact was untrue; (3) that the untrue representation was made knowing the representation to be untrue or recklessly without caring whether it was true or false; (4) that Monsanto made the representation with the intent to deceive and induce Major Mat to act on it to its pecuniary damage; and finally, (5) that Major Mat believed the representation of fact to be true and relied upon it to its damage. WIS.JI–CIVIL 2401.

■ Although we believe Major Mat fails to raise a genuine issue of material fact regarding any of the first four elements of misrepresentation,[1] we will begin and end our analysis with the fifth: whether Major Mat relied on Monsanto's statements to its detriment. It did not. As we noted above, long before Storm sought a contract for S–54, or assurance that Monsanto would not compete, Major Mat formed as a partnership, moved to Wisconsin, began production, and placed several orders for S–54 "in rapid succession." Major Mat simply continued to do what it had been doing before its conversations with Monsanto. The district court's entry of summary judgment in Monsanto's favor on this claim, therefore, was appropriate.

### IV.

■ Finally, Major Mat claims that Monsanto unjustly enriched itself by appropriating the market for S–54 golf tee mats that Major Mat created, and that it raised a

---

1. In its brief, Major Mat admits that there is no evidence of misrepresentation on the part of Monsanto back in June of 1983 when the original promise to provide an unending supply of the necessary material for whatever purpose Major Mat would need it for. Its explanation that its inventory was always so large with remnants that selling it and storing it were huge problems for the company, and they could run new stock at the price of the remnants and still make a profit, were all probably true. Appellant's Brief at 34.

genuine issue of material fact regarding this claim. Unjust enrichment requires Major Mat to show that: (1) it conferred a benefit on Monsanto; (2) Monsanto appreciated or knew of this benefit; and (3) Monsanto accepted or retained this benefit under circumstances making it inequitable for it to retain the benefit without payment of its value. *Puttkammer v. Minth*, 83 Wis.2d 686, 266 N.W.2d 361, 363 (1978). The classic illustration of unjust enrichment, offered to every first-year law student, involves the man sitting on his front porch swing watching a neighborhood child mow his lawn, without a word having been exchanged between them. Having accepted the benefit of the child's lawn service, a quasi-contract is formed, and he must pay the child in *quantum meruit*.

In Wisconsin, unjust enrichment further "requires a wrongful taking or appropriation of others' property to one's own use." *Abbott Laboratories v. Norse Chemical Corp.*, 33 Wis.2d 445, 147 N.W.2d 529, 541 (1967). In *Abbott Laboratories*, the Wisconsin Supreme Court held that customer lists and marketing knowledge are not property for the purposes of an unjust enrichment action. As Monsanto points out, if customer lists and marketing knowledge are not property, then neither is exploiting an already existing market. It was not even an exclusive market. Major Mat already had competition from other manufacturers before Monsanto began producing its own mat. Transcript of Hearing of October 11, 1991, at 24. Major Mat's distinction was in its use of S–54 Astro-Turf, an exclusive Monsanto product. Under these facts, Major Mat enjoyed the benefit of Monsanto's trademarked property for its use! Summary judgment on this cause of action, therefore, was not erroneous.

## V.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.