**KNAUF REALTY, LLC, Robb R. Knauf, and Craig R. Knauf, Plaintiffs,**

v.

**PRUDENTIAL REAL ESTATE AFFILIATES, INC., a Delaware corporation, Defendant.**

No. 06–C–0426–C.

United States District Court, W.D. Wisconsin.

May 23, 2007.

E. Campion Kersten, Kersten & McKinnon, S.C., Milwaukee, WI, for Plaintiffs.

Alan H. Silberman, Sonnenschein Nath & Rosenthal, LLP, Chicago, IL, for Defendant.

## OPINION and ORDER

CRABB, District Judge.

In this civil action for money damages, plaintiffs Robb and Craig Knauf and Knauf Realty, LLC, bring a Wisconsin state law promissory estoppel claim against defendant Prudential Real Estate Affiliates, Inc. Plaintiffs allege that defendant and its representatives made promises of a real estate franchise to plaintiffs and that plaintiffs relied reasonably on the promises to their detriment by signing a lease for office space and paying for office improvements that proved unusable after the franchise negotiations failed.

Plaintiffs filed this action in the Circuit Court for Dane County, Wisconsin and defendant removed the case to federal court. Jurisdiction is present under 28, U.S.C. § 1332.

Now before the court is defendant's motion for summary judgment. I conclude that the statements defendant's agents made to plaintiffs did not amount to promises that defendant would have reasonably expected would induce plaintiffs to lease office space or pay for office improvements when they did. I conclude also that it would be unjust to enforce the alleged promises. Because plaintiffs cannot show that they can prove the essential elements of a claim of promissory estoppel claim, I will grant defendant's motion for summary judgment.

Also, I will grant defendant's unopposed "request to allow correction of clerical error." Dkt. # 34. In the motion, defendant states that one of its exhibits was marked erroneously; I have considered the correct document in evaluating defendant's motion for summary judgment.

Before turning to the undisputed facts, a brief note about their origin is warranted. First, I have disregarded facts included in plaintiff's brief that were not properly pro-posed and supported by admissible evidence. *Procedures to be Followed on Motions for Summary Judgment*, I.B.4. ("The court will not consider facts contained only in a brief.").

Next, defendant contends that many of plaintiffs' responses to its proposed findings of fact are improper because they rely on statements included in affidavits of plaintiffs Robb and Craig Knauf that are inconsistent with their prior deposition testimony. It is true that "courts do not countenance the use of so-called 'sham affidavits,' which contradict prior sworn testimony, to defeat summary judgment." *United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 466 (7th Cir.2005); *see also Cowan v. Prudential Ins. Co. of America*, 141 F.3d 751, 756 (7th Cir.1998). However, after reviewing plaintiffs' responses and their prior deposition testimony, it appears that much of the information contained in these affidavits may be read to supplement prior deposition testimony, rather than contradict it. In several instances, plaintiffs Robb and Craig Knauf gave broad and arguably evasive answers to questions in their depositions, only to offer specific information in their affidavits. Although one could question plaintiffs' delay in coming forward with evidence that is important to their case, the sham affidavit rule is limited to blatant contradictions, not elaborations on ambiguous testimony that the other party failed to clarify during a deposition.

However, there were several instances when I did find such a contradiction. For example, I have treated as undisputed defendant's proposed finding of fact # 63, which states that plaintiff Robb Knauf knew that plaintiffs were waiting for Ed Ledwidge's affidavit in March 2004, because this is taken directly from plaintiff Robb Knauf's deposition testimony. His

later disavowal of this statement in his affidavit is impermissible under the sham affidavit rule.

From the parties proposed findings of fact and supporting materials, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

### A. *Parties*

Plaintiff Knauf Realty, LLC, is a Wisconsin limited liability company formed on March 4, 2004. Plaintiffs Robb and Craig Knauf are the sole members of plaintiff Knauf Realty, LLC; each owns fifty percent. Plaintiffs Robb and Craig Knauf are Wisconsin citizens.

Defendant Prudential Real Estate Affiliates, Inc., is a Delaware corporation, with its principal place of business in Irvine, California. Defendant conducts business in Wisconsin by establishing franchise agreements with selected individuals who operate real estate brokerage offices using defendant's trademarks and trade names.

### B. *Franchise Negotiations*

In November 2003, plaintiffs Robb and Craig Knauf decided to enter the real estate brokerage business and pursued a Madison, Wisconsin franchise with defendant, which had no Madison franchises at the time. On November 3, 2003, in response to plaintiff Craig Knauf's inquiries, defendant mailed plaintiffs its promotional materials.

Throughout plaintiffs' franchise application process, defendant was represented by its regional account executives Charles "Tony" Porterfield and Michael Porterfield. At the Porterfields' suggestion, plaintiff Robb Knauf moved from Eau Claire to the Madison area, near his brother in Madison. On approximately November 13, 2003, the Porterfields met with plaintiffs Robb and Craig Knauf to discuss defendant's business and franchise operations. The Porterfields advised plaintiffs that there were two steps in the franchise application process: (1) preliminary approval, or approval in principle; and (2) final approval. On November 28, 2003, plaintiffs Robb and Craig Knauf signed defendant's Personal/Business Information and Authorization Forms, which stated:

> As a prospective franchisee of [defendant], I understand that [defendant] reserves the right to approve or disapprove the franchise application in its sole discretion. No franchise with [defendant] is effective until the Franchise Agreement has been signed by both parties.

By late November 2003, plaintiff Robb Knauf understood that final approval required multiple steps, including (1) procuring a broker's license; (2) finding a broker or agent with $250,000 in commission-generated income and signing an agreement with that person; and (3) "lin[ing] up" suitable office space. On December 4, 2003, plaintiff Craig Knauf received a copy of defendant's "Franchise Offering Circular," which included defendant's standard franchise agreement, providing, among other things, that all franchise terms will be in writing, that there are no oral agreements and that no "officer or employee or agent of [defendant] has authority to make any representation or promise not contained in this Agreement."

In December 2003 and January 2004, plaintiffs Robb and Craig Knauf compiled and prepared documents required for their franchise application and communicated frequently with the Porterfields about the franchise. To meet defendant's requirement that the franchise have at least one agent who had earned more than $250,000 in commission-generated income in the real estate business, plaintiffs Robb and

Craig Knauf tried to persuade Ed Ledwidge to join their firm. Ledwidge was an agent who met the income requirement. On January 22, 2004, Ledwidge completed the affidavit required for plaintiffs' application to defendant, but he marked the date on which he would transfer his broker's license to Knauf Realty, LLC as "? ?."

Before January 22, 2004, plaintiffs Robb and Craig Knauf searched for office space with assistance from the Porterfields. The Porterfields identified several potential locations for plaintiffs' office. On at least one occasion, they accompanied plaintiffs while visiting these spaces. The Porterfields emphasized the need to secure office space "soon" in order to start the business. Plaintiffs needed defendant's approval of any office location. By early February 2004, with the help of the Porterfields, plaintiffs had identified a desirable office location at the MarketPlace Retail Center, which, the Porterfields assured them, would be acceptable to defendant as a location for the franchise.

On February 24, 2004, plaintiff Robb Knauf received a lease from the landlord for the MarketPlace location; he submitted a copy of the proposed lease to defendant. Either before that date or shortly after it, Tony Porterfield assured plaintiff Robb Knauf that the franchise was "on track" for approval. He said that plaintiffs had been approved in principle and that he was sending additional paperwork to them. Also on February 24, 2003, the Porterfields' supervisor asked defendant's headquarters to schedule a meeting of the franchise approval committee to consider plaintiffs for "approval-in-principle." The following day, Michael Porterfield notified defendant's headquarters that Ledwidge intended to transfer his brokers license to plaintiffs' firm on April 2, 2004.

On February 24, plaintiff Robb Knauf submitted his Legal Questionnaire to the Porterfields. In response to a question whether the signatory had committed any crimes, with "crimes" defined immediately below the question to include felonies and misdemeanors, plaintiff Robb Knauf marked "none" and submitted it, although he had been convicted of several misdemeanor offenses in 1999 and 2000. Just above his signature, the form included the following disclaimer:

> I hereby certify that the above information is true and correct to the best of my knowledge and belief. I agree to notify [defendant] in writing of any changes in this information.... I understand and acknowledge that my franchise (if awarded) may be terminated without notice if I knowingly either inaccurately report or fail to report any information as part of my application or qualification as a franchisee.

On February 26, 2004, defendant's franchise approval committee met to discuss plaintiffs' application. The committee agreed to draft and send to plaintiffs Robb and Craig Knauf a letter advising them, "We welcome your interest as it matches our desire to create a presence for PREA in your marketplace. Should your company meet the standard requirements for affiliation [with] PREA, we would be delighted to welcome you in to the PREA family...." The letter continued:

> As you know, PREA has specific polices [sic] and procedures in place that will evaluate your company financially, legally and operationally for consideration to become a Prudential Real Estate franchise. This process must be completed and reviewed before we can issue a final approval for affiliation. Frequently, we require further information or clarification during the process, and occasionally we must deny approvals for not meeting [defendant's] requirements.

This letter does not create any obligations that are binding on either [defendant] or your Company because no actions have started with [defendant's] due diligence review. Please be advised that under no circumstances will either party be bound unless and until all final internal approvals are obtained, final documents are executed and delivered by both parties, and all conditions have been met.

Defendant encouraged plaintiffs to contact Patti Ray, defendant's senior vice president and a member of the franchise committee, if they had any questions regarding the letter. Plaintiffs received and read defendant's letter on February 27, 2004. They did not communicate with Ray or the Porterfields about its contents.

In preparing to enter into the franchise agreement, plaintiffs retained a lawyer, with whom they met on lawyer on February 10 and 27, 2004. The lawyer reviewed the MarketPlace lease on March 1, 2004. Robb Knauf signed the lease sometime after February 27, 2004, after he had read defendant's letter, and he signed the guaranty on March 1, 2004. In various portions of the lease and guaranty, the tenant is identified as "Prudential (Knauf Realty, LLC)" and "Prudential Knauf Realty, LLC."

Sometime after March 10, 2004, plaintiffs Robb and Craig Knauf met with the Porterfields to discuss the franchise application paperwork. At the meeting, the parties "went over the documents to make sure everything was in line and having Ed [Ledwidge's] affidavit because [plaintiff Robb Knauf] believe[d] that's what [plaintiffs] were kind of waiting for." The Porterfields told plaintiffs that their paperwork was substantially complete and that the application would be submitted for approval the following week.

Plaintiff Robb Knauf received a proposal from a contractor, dated March 13, 2004, to "build-out" the MarketPlace office. Plaintiffs decided to go ahead with the work.

On March 18, 2004, Michael Porterfield was notified that plaintiffs' application was incomplete; it lacked a proper transfer date, plaintiff Robb Knauf's answers to the initial Legal Questionnaire conflicted with a criminal background check defendant had obtained in January 2004. On March 19, 2004, Ray, the Porterfields and plaintiff Robb Knauf met to discuss plaintiffs' application. Ray told plaintiff Robb Knauf that he needed to explain his criminal record in writing as well as the answer denying his record on the Legal Questionnaire.

On April 13, 2004, plaintiff Craig Knauf submitted his tax return. After this correspondence, defendant did not indicate whether plaintiffs' application had been approved or rejected. Ledwidge never transferred his real estate license to plaintiffs' firm and plaintiffs failed to locate other brokers able to fulfill the minimum "$250,000 commission generated income" requirement.

In September 2004, plaintiffs learned that defendant had entered a separate franchise agreement with another individual. Only at this time did plaintiffs conclude that their application to defendant had been denied.

On May 20, 2005, MarketPlace Retail Partners notified plaintiffs and plaintiffs' parents that they intended to sue plaintiffs for back rent. On June 23, 2005, MarketPlace Retail Partners filed suit against plaintiff Knauf Realty, LLC, plaintiff Robb Knauf and Kimberly Knauf in the Circuit Court for Marathon County, Wisconsin. The Knaufs failed to answer, and a default judgment of $193,252 was entered against them. No part of this judgment has been paid.

## OPINION

■ Plaintiffs rest their case on their claim of promissory estoppel; in other words, plaintiffs contend that defendant made promises to plaintiffs that estop defendant from denying that it agreed to enter into a franchise agreement with plaintiffs. Promissory estoppel is a equitable or quasi-equitable common law doctrine intended to protect parties that have not entered into a contract but none the less incurred damages acting in reliance on promises made by another party. *Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 697–98, 133 N.W.2d 267 (1965) (endorsing doctrine of promissory estoppel and adopting it in Wisconsin). (Because all of the events at issue took place in Wisconsin, and because courts sitting in diversity are to apply the substantive law of the forum in which they sit, I apply Wisconsin promissory estoppel law to this case. *Sound of Music Co. v. 3M*, 477 F.3d 910, 915 (7th Cir.2007) (citing *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)).)

■ To prevail on a promissory estoppel claim under Wisconsin law, a plaintiff must show that (1) there was "[a] promise that the promisor should reasonably have expect[ed] to induce action or forbearance of a definite and substantial character on the part of the promisee;" (2) the promise "induce[d] such action or forbearance;" and, (3) the "injustice can be avoided only by enforcement of the promise." *Hoffman*, 26 Wis.2d at 698, 133 N.W.2d 267. Other courts, including the Court of Appeals for the Seventh Circuit, break the test down into four factors, including "1) a promise; 2) on which the promisor should reasonably expect to induce action or forbearance; 3) which did induce such action or forbearance; and 4) that injustice can be avoided only by enforcement of that promise." *Beer Capitol Distributing, Inc. v. Guinness Bass Import Co.*, 290 F.3d 877, 880 (7th Cir.2002); *see also Cosgrove v. Bartolotta*, 150 F.3d 729, 733 (7th Cir. 1998) (describing type of promise required for pleading promissory estoppel in Wisconsin). The difference is unimportant. In either analysis, the reviewing court must determine whether there was a promise and whether it was one the promisor should expect would induce reliance.

■ According to the Court of Appeals for the Seventh Circuit, a promise "is a manifestation of intent by the promisor to be bound, and is to be judged by an objective standard." *Major Mat Co. v. Monsanto*, 969 F.2d 579, 583 (7th Cir. 1992). "Mere predictions or statements of opinion are not promises supportive of a promissory estoppel cause of action." *Id.* at 583. Additionally, there must be a degree of specificity to the promise. *Seater Construction Co., Inc. v. Rawson Plumbing, Inc.*, 2000 WI App. 232, ¶ 24, 239 Wis.2d 152, 162–63, 619 N.W.2d 293, 298 (finding construction bid to be promise and noting that "[t]he terms of the bid were unequivocal and clear"); *see also* E. Allan Farnsworth, *Farnsworth on Contracts*, § 2.19, p. 175 & n. 30 (promise must be "clear and definite"). The critical requirement is that the "promise" be "one that the promisor should reasonably have expected to induce either action or forbearance" by the plaintiff. *U.S. Oil Co. v. Midwest Auto Care Services, Inc.*, 150 Wis.2d 80, 89, 440 N.W.2d 825, 828 (Ct. App.1989). Otherwise, the promisee has no basis for insisting upon enforcement of the promise. "[T]he reliance that makes the promise legally enforceable must be induced by a reasonable expectation that the promise will be carried out." *Cosgrove*, 150 F.3d at 733.

■ Thus, to withstand a motion for summary judgment, a plaintiff pursuing a

promissory estoppel claim must begin by adducing evidence from which a reasonable jury could conclude that the defendant made a promise that it reasonably believed would induce reliance by the promisee. In this instance, no reasonable jury could find that defendant made promises to plaintiffs that defendant had reason to believe would be carried out. It is true that the Porterfields made assurances to the individual plaintiffs about the probability of obtaining a franchise from defendant and that they did so as defendant's agents, but those assurances must be set in context with the repeated warnings from defendant that the deal would not be closed until the parties executed final documents. On at least two occasions, at the beginning of the franchise discussions and again just before plaintiffs signed their lease, defendant repeated its warning to plaintiffs that only written agreements would be binding on defendant. Plaintiffs may have wanted to believe that defendant had made a binding promise to them before they made the large financial commitment to take a lease and proceed with a build-out, but no reasonable jury could find that defendant had made such a promise.

Moreover, another obstacle stands in plaintiffs' way. In support of their argument that the Porterfields made enforceable promises to them, plaintiffs assert repeatedly that the Porterfields "assured" them that they would be given a franchise. Plaintiffs do not specify exactly what the Porterfields promised plaintiffs. Without evidence of the actual statements that allegedly induced plaintiffs' detrimental reliance, it would be impossible for plaintiffs to prevail on their claim at trial. *Compare Seater Construction Co., Inc.*, 2000 WI App. 232, ¶ 24, 239 Wis.2d at 162–63, 619 N.W.2d at 298 ("Rawson's bid was definite and it reasonably expected the bid to induce action by Seater."). If plaintiffs had evidence of specific statements, they

should have provided that evidence at this time. *Schacht v. Wisconsin Department of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999) (summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events").

Plaintiffs cannot prevail even if I accept plaintiffs' version of the disputed substance of Tony Porterfield's statements to plaintiff Robb Knauf during their phone conversation on approximately February 24, 2004, as I must when deciding a motion for summary judgment, *Hall v. Bennett*, 379 F.3d 462, 464 (7th Cir.2004) (on summary judgment factual disputes resolved in favor of nonmoving party). Plaintiffs allege that Tony Porterfield responded to plaintiff Robb Knauf's request for assurance that he should "make a big financial commitment" and sign the lease for the MarketPlace office space by saying that "all of the Knaufs' documents were in place; that they had been approved in principle and that the franchise committee would give final approval at its meeting the following Thursday."

Although this statement might qualify as a promise in common parlance, no jury could find that it supports plaintiffs' promissory estoppel claim. It is true that Tony Porterfield spoke in definite language and knew that plaintiffs were about to sign a lease and that the Porterfields had strongly encouraged plaintiffs to proceed in the application process. However, only a few days later, and before plaintiffs signed the lease, defendant had sent them a letter specifying that

> This letter does not create any obligations that are binding on either [defendant] or your Company because no actions have started with [defendant's] due diligence review. Please be advised

that under no circumstances will either party be bound unless and until all final internal approvals are obtained, final documents are executed and delivered by both parties, and all conditions have been met.

The letter supplemented earlier information that defendant had sent to plaintiffs, including defendant's standard franchise agreement, which provides, among other things, that all franchise terms must be in writing, there would be no oral agreements and no "officer or employee or agent of [defendant] ha[d] authority to make any representation or promise not contained in th[e] [franchise] Agreement." Moreover, it is clear that, at the time plaintiffs signed the lease, they knew that they had not submitted all of the materials needed for final approval, that they had not received final approval and that the approval committee would make this decision, not the Porterfields, Plaintiffs may have heard what they wanted to hear, but a reasonable person in their position could conclude only that Tony Porterfield's statement was a mere prediction. In light of this, a reasonable jury would not conclude that defendant promised plaintiffs a franchise and that plaintiffs relied on this promise to their detriment when they signed the lease for office space.

Next, even if Tony Porterfield's statement on February 24, 2004 influenced plaintiffs' decision to sign the lease, it could not have affected their decision to sign the build-out agreement for the office space. It was clear by then that final approval of the franchise agreement "by next Thursday," had not happened. When plaintiffs signed the build-out agreement, they were aware that they had still not received final approval and that their application was incomplete. They also knew that defendant had questions about plaintiff Robb Knauf's criminal background and

were concerned about the manner in which he had filled out the legal questionnaire.

■■■ Defendant does not argue that plaintiffs could not show the second element of a claim of promissory estoppel (that the promise induced action or forbearance), but they maintain that the plaintiffs could not establish the final element of the claim, that enforcement of the promise is the only way to avoid injustice. This element also involves a determination of reasonableness. *Skebba v. Kasch*, 2006 WI App 232, ¶ 9, 724 N.W.2d 408 (citing *Hoffman*, 26 Wis.2d at 699, 133 N.W.2d 267). However, this determination is to be made by the court rather than the jury. *Id.* The Wisconsin Court of Appeals has identified five factors that courts should consider when evaluating this element, including whether the reliance on the promise was reasonable. *U.S. Oil Co.*, 150 Wis.2d at 92, 440 N.W.2d 825 (adopting factors contained in *Restatement (Second) of Contracts* § 139(2) (1981)). These factors include

(a) the availability and adequacy of other remedies, particularly cancellation and restitution;

(b) the definite and substantial character of the action or forbearance in relation to the remedy sought;

(c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;

(d) the reasonableness of the action or forbearance;

(e) the extent to which the action or forbearance was foreseeable by the promisor.

*Id.*

Even if a reasonable jury could find that Tony Porterfield's statement on February 24, 2004 constituted a promise that

plaintiffs' franchise application would be approved, I could not find that justice requires enforcement of the promise. Plaintiffs' reliance on Tony Porterfield's statement was not reasonable. Plaintiffs ignored all of the evidence and efforts by defendant to inform them of the remaining problems with their franchise agreement. Instead, they purported to rely on a statement by someone they knew did not have final approval power about what would happen at the committee meeting a week later. It would be unjust to enforce defendant's agents' verbal promises when defendant had taken such pains to make it clear to plaintiffs that it would be bound only under explicitly defined conditions.

## ORDER

IT IS ORDERED that

1. Defendant Prudential Real Estate Affiliates, Inc.'s motion "to allow correction of clerical error in connection with its pending motion for summary judgment" is GRANTED.

2. Defendant's motion for summary judgment is GRANTED with respect to the promissory estoppel claim of plaintiffs Robb and Craig Knauf and Knauf Realty, LLC.

3. The clerk of court is directed to enter judgment for defendant and close this case.